Filed 5/22/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


**SHC HALF MOON BAY,**

    **Plaintiff and Appellant,**                      **A137218**

    **v.**                                     **(San Mateo County**
                                               **Super. Ct. No. CIV499595**)

**COUNTY OF SAN MATEO,**

    **Defendant and Respondent.**

_____/

"[T]he California Constitution requires generally the assessment of property at 'fair market value' . . . [A]ssessors have a constitutional mandate to tax all property at fair market value if not exempt under federal or state law." (See *Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 606-607 (*Elk Hills*).) "Intangible assets and rights are exempt from taxation and . . . shall not enhance or be reflected in the value of taxable property." (Rev. & Tax. Code, § 212, subd. (c).)[1] Section 110, subdivision (d) prevents the direct taxation of "intangible rights and assets relating to the going concern value of a business" and mandates the "value of intangibles that directly enhance that income stream cannot be subsumed in the valuation of taxable property (§ 110(d)(1)), and

---

[1]     Unless otherwise noted, all further statutory references are to the Revenue and Taxation Code.

1

must be deducted . . . from an income stream analysis prior to taxation."[2] (*Elk Hills, supra,* 57 Cal.4th at pp. 618-619.)

In *Elk Hills*, our high court clarified which intangible assets and rights have "a quantifiable fair market value that must be deducted from an income stream analysis prior to taxation" pursuant to sections 110 and 212. (*Elk Hills, supra,* 57 Cal.4th at p. 619.) As the court explained, "intangible assets like the goodwill of a business, customer base, and favorable franchise terms or operating contracts all make a direct contribution to the going concern value of the business as reflected in an income stream analysis" and have "a quantifiable fair market value that must be deducted from an income stream analysis prior to taxation." (*Id.* at pp. 618, 619.)

This appeal arises from a dispute regarding the property tax assessment of the Ritz Carlton Half Moon Bay Hotel (the hotel or the property) and presents "the question of how to properly value taxable property, with associated intangible assets, at fair market value." (*Elk Hills, supra,* 57 Cal.4th at p. 605.) Appellant SHC Half Moon Bay, LLC (SHC), the hotel's owner, claims the assessment conducted by the San Mateo County Assessor (Assessor) and approved by the San Mateo County Assessment Appeals Board (the Board) erroneously inflated the value of the hotel by including $16,850,000 in nontaxable intangible assets. SHC's principal contention is the variation of the income approach the Assessor used to assess the hotel violates California law by failing to identify and remove the value of intangible assets. Respondent County of San Mateo (the County) urges this court to uphold the assessment.

---

[2]     There are three basic methods for determining full cash or fair market value: "(1) the market data method [citations]; (2) the income method [citations]; and (3) the cost method [citations]." (*Bret Harte Inn, Inc. v. City and County of San Francisco* (1976) 16 Cal.3d 14, 24; *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828.) "Using the income approach, an appraiser 'estimates the future income stream a prospective purchaser could expect to receive from the enterprise and then discounts that amount to a present value by use of a capitalization rate.'" (*Elk Hills, supra,* 57 Cal.4th at p. 604, quoting *GTE Sprint Communications Corp. v. County of Alameda* (1994) 26 Cal.App.4th 992, 996 (*GTE Sprint*).)

Applying a de novo standard of review, we conclude the income approach used by the Assessor and approved by the Board to assess the hotel violated California law because it "failed to attribute a portion of [the hotel's] income stream to the enterprise activity that was directly attributable to the value of intangible assets and deduct that value prior to assessment." (*Elk Hills, supra,* 57 Cal.4th at p. 618; §§ 110, subd. (d), 212, subd. (c); *Sky River LLC v. County of Kern* (2013) 214 Cal.App.4th 720, 735 (*Sky River*).)[3] Specifically, we conclude the income method at issue here violated section 110, subdivision (d) by failing to remove the value of the hotel's workforce, the hotel's leasehold interest in the employee parking lot, and the hotel's agreement with the golf course operator prior to the assessment.

FACTUAL AND PROCEDURAL BACKGROUND

The four-star luxury hotel is located on approximately 14 acres of land "on the bluffs of the Pacific Coast" at 1 Miramontes Point Road in Half Moon Bay.[4] Constructed and opened in 2001, the hotel comprises five structures, including a six-story main building with 209 guest rooms, a "signature" restaurant, a "world class spa" and salon, a fitness center, and a lounge. "[T]hree adjacent bungalows" contain 52 additional guest rooms. The hotel also includes an executive conference center, tennis courts, a basketball court, a pool and jacuzzi, and a three-level parking structure. The hotel is "situated between two of the United States' finest golf courses" and "[g]uests have full privileges at both courses."

SHC purchased the hotel for $124,350,000 in 2004. The purchase price included real property, personal property (e.g., furniture, fixture and equipment), and intangible assets and rights. At the time of sale, the Ritz Carlton Hotel Company, LLC managed the

---

[3]    We disregard the County's reference to an Internet article published during the pendency of this appeal because it was not before the Board or trial court (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3) and the County did not file a request for judicial notice in compliance with California Rules of Court, rule 8.54.

[4]    The property consists of two parcels, Assessor's Parcel Numbers 066-092-770 and 066-092-780 (the property), which we refer to collectively.

3

fully-operational hotel pursuant to a long-term management agreement. In 2004, the Assessor assessed the hotel pursuant to Proposition 13 at its purchase price of $124,350,000 and deducted the value of personal property, for a total value of $116,980,000. The Assessor enrolled the hotel at its purchase price of $124,350,000 because the appraised value was within five percent of the purchase price. SHC timely paid the property taxes.

*SHC's Appeal to the Board*

SHC challenged the 2004 property tax assessment, claiming it erroneously included the value of $16,850,000 in nontaxable intangible assets, specifically: (1) the hotel's workforce; (2) the hotel's leasehold interest in the employee parking lot; (3) the hotel's agreement with the golf course operator; and (4) goodwill. SHC claimed the income approach was "not appropriate for California property tax purposes" because it failed to identify and exclude intangible assets.

According to SHC, the proper method to exclude intangible assets from the assessment was not simply to deduct the hotel's management and franchise fee, but to identify, value, and deduct specific categories of assets in accordance with Section 502 of the Assessors' Handbook, which provides that "'the deduction of [a] management fee from the income stream of a hotel does not recognize or remove the value attributable to the business enterprise that operates the hotel.'" (Bd. of Equalization, Assessors' Handbook, Section 502; Advanced Appraisal (Dec. 1998) p. 162 (Assessors' Handbook), fn. omitted.) SHC argued the Assessors' Handbook is "completely at odds" with the Assessor's appraisal and claimed the deduction of a management and franchise fee did not adequately remove intangible property from the assessment.

A. SHC's Valuation and Evidence

James A. Gavin, Director of Duff & Phelps, prepared a report allocating "relevant tangible and intangible assets of the [property] pursuant to the accounting and reporting requirements of Statement of Financial Accounting Standards, No. 141, *Accounting for Business Combinations* [(FASB 141)]. . . . The intended use of the analysis [was] to provide an allocation of value . . . for financial reporting purposes." Using the cost

4

method, Gavin determined the value of the hotel's tangible assets was $99,500,000, comprised of land value of $20,100,000 and $79,400,000 in building and site improvements. Gavin allocated $107,500,000 of the property's purchase price to tangible assets. He allocated $16,850,000 to intangible assets and identified the following intangible assets and estimated their value: (1) the hotel's assembled workforce ($1,000,000); (2) the hotel's leasehold interest in the employee parking lot ($200,000); (3) the hotel's agreement with the golf course operator ($1,500,000); and (4) "goodwill" ($14,150,000).

At the Board hearing, Gavin testified as an expert for SHC and explained, among other things, how he calculated the $16,850,000 value of intangible property. He stated, "[t]he goodwill in this case is a residual. It is basically taking the purchase price and working your way through all the different elements and all the different . . . tangibles and intangibles to get down to what is left over." Gavin explained how he calculated the $14,150,00 value of goodwill: "from an accounting perspective, . . . there is some type of premium being paid or value being asserted to a property based on whether it is the flag [i.e., brand], whether it's the location, whatever it might be. We think there's something there. [¶] So essentially that's how we got that [$14,150,000], because again it's a residual with all the other numbers combined, and deducted off the purchase price."

Gavin conceded the income method "is how the people in the marketplace that are trading hotels look at hotels" but urged the Board to value the hotel in accordance with the Assessors' Handbook, which recommends intangible assets and rights be separately identified, valued, and deducted from the entire business enterprise as a going concern to arrive at taxable value of the property.

B.     The County's Valuation and Evidence

The County claimed the deduction of the management and franchise fee pursuant to the income approach excluded the value of nontaxable intangible assets. It argued SHC's appraisal applied a "controversial methodology that is not generally followed in the appraisal industry or by the Assessor's Offices for valuing hotel real property." As the County explained, SHC's method "essentially places a per square foot dollar value on

5

the land and improvements and subtracts that amount from the purchase price. What is left, [SHC] says, is its 'intangible' goodwill value," which it claims "cannot be taxed." The County contended SHC's "assumptions and methodology . . . do not reflect the realities of the hotel market. The method used by the Assessor (popularly known as the Rushmore Method) better recognizes those realities and is supported by the Appraisal institute."[5] According to the County, the FASB 141 analysis is used "for purposes of financial reporting" not for "deciding the real property value."

The Assessor employed the sales approach, the cost approach, and the income approach to value the hotel and determined the "income capitalization approach" provided "the most persuasive and supportable conclusions when valuing a lodging facility." As the Assessor explained, "[w]e used the Rushmore approach to valuation which is considered to be the accepted and widely used method in the hospitality industry. Basically, the net operating income from a stabilized year is calculated by removing the income attributable to and the business/going concern. What is left is the income attributable to the land and improvements. This is then capitalized into an estimate of value."

Using the income approach, the Assessor derived a stabilized income stream for the hotel and then estimated the hotel's stabilized occupancy rate of 71 percent with net revenue per room of $330 at 3 percent. After reducing projected income for fixed expenses such as insurance, subtracting $1.6 million in management and franchise fees, and deducting for reserves and taxes, the Assessor estimated the hotel's net operating income to be 18 percent. Utilizing a capitalization rate of 6.5 percent, the Assessor

---

[5] The Rushmore Method or Rushmore Approach, a species of the income method, is a model of hotel valuation developed by Stephen Rushmore, "'a well recognized and eminent expert in the field of hotel appraisers.'" (*Marriott Corp. v. Bd. of County Com'rs* (Kan. App. 1999) 972 P.2d 793, 796.) The Rushmore Method allocates a hotel's value among the real, business, and personal property components: it separates the business component by deducting management and franchise fees from the hotel's stabilized net income and handles the tangible personal property component by deducting a reserve for replacement along with the actual value of the personal property in place. (See *Chesapeake Hotel LP v. Saddle Brook Township* (N.J. Tax 2005) 22 N.J. Tax 525.)

concluded the fair market value of the hotel was $129,700,000. The Assessor then deducted $7,340,000 in personal property and determined the value of the hotel was $122.3 million, a value within five percent of the roll value of $116,980,000. According to the Assessor, "[s]ince the appraised value is within 5% of the indicated sale price of $124,350,000, the purchase price assumption [ ] validates the base year enrollment."

In a written report, Thomas E. Callahan, Co-President and CEO of what is now First Service PKF Hospitality, critiqued Gavin's report. Callahan determined the cost approach was an "inappropriate" method to value the property "for property tax assessment purposes." According to Callahan, "[h]otels, which are income producing properties, are typically valued using the income capitalization approach by the investment community and this is the approach which should be [ ] used for property tax purposes." Callahan concluded the "intangible or business value associated with a hotel is typically removed from the value of the hotel's real property through the deduction of a market rate management and (if appropriate) franchise fee. The resulting income stream after this deduction is typically viewed by the investment community as a return on . . . the hotel's real and tangible personal property. In the case of the [hotel], the majority of the property's business value has been removed through the deduction of the management fee payable to the Ritz Carlton Hotel Company, LLC. In addition to the deduction of market rate management and franchise fee, the capitalized value of pre-opening expenses (e.g. the cost of assembling and training a work force, pre-opening marketing, etc.) necessary to open the business is also often deducted as an intangible value of the hotel." Callahan opined Gavin's report "significantly understated" the replacement cost per hotel guest room. According to Callahan, using a "more realistic cost" per guest room increases the value of the hotel's "tangible real and personal property . . . from approximately $107.5 million to $128.3 million[.]"

Callahan testified as an expert on hotel valuations for the Assessor. He explained "almost all investors primarily use the income approach or the income capitalization approach in developing the value of a hotel" and that, "generally speaking in the industry, the view is the deduction of a market rate management franchise fee from the income

7

stream of the hotel strips out the majority — not all, but the majority of the intangible value of the property." Callahan explained "[t]he reason for that [ ] is . . . hotels are operating businesses. . . . They do rent guest rooms, sell food and beverage facilities. They put on weddings, events, all those types of things. [¶] In lieu of leases, which are typical in most other types of real estate[,] [p]eople enter into management agreements with companies like the Ritz Carlton Hotel Company."

Callahan described management agreements and noted, "the concept in the hotel industry is [to] . . . deduct an appropriate market rate management fee and sometimes franchise fee, and . . . you're getting down to pretty much a pure point asset income that's a return on the tangible, real and personal property." He noted "other components . . . should be deducted" such as "the deduction of a capitalized value for developing the workplace in force . . . but those are pretty small dollar amounts." Callahan conceded these assets — the hotel's workforce, the hotel's leasehold interest in the employee parking lot, and the hotel's agreement with the golf course operator — totaled $2.7 million.

Later, Callahan elaborated: "[a]nother argument . . . is also deducting the capitalized value of the labor in force, pre-opening expenses and working capital. [¶] For a property of this caliber, that would probably be about $6,000 per guest room. . . . So . . . the question is [whether] the majority of the business value is taken out in the management and franchise fee. It's either a hundred percent or it's like ninety percent. [¶] There's an argument that I think is worthy of making[,] of taking off an additional item. . . . Not the goodwill line item for 14 million dollars,[6] but . . . a million dollars for labor in place. . . . But it's relatively small dollars when we're talking about a hotel of this caliber." Finally, Callahan opined the Assessor used the proper methodology to value the

---

[6]    The County took the position that "[i]f you follow the income approach, the goodwill is accounted for within the management fee." Callahan testified "there is no residual goodwill" using the cost method. He explained, "Even forgetting about the argument that should you deduct management fees, is that the proper way to determine intangible value, pushing that all off, just using a buildup approach of replacement cost, the value of this hotel is at least equal to the purchase price. There is no goodwill."

property. He testified the cost method was not "the appropriate approach to value the real tangible and personal property" and was "absolutely always wrong for luxury properties." Callahan also noted he "disagreed" with the Assessors' Handbook.

Deputy Assessor Angela Hunter explained how the assessment was conducted and testified — without explanation — the deduction of $1.6 million for the management and franchise fee accounted for all intangible assets, including goodwill. The County submitted articles describing the Rushmore Approach for valuing hotel property; it also submitted the California Assessors' Association's position paper 99-003 rejecting the Assessors' Handbook and recommending assessors use the California Assessors' Association's version of those materials. The County explained the "California Assessor[s'] Association does not agree with the [ ] Assessor[s'] Handbook. . . . It's not binding on the assessor's effort. [¶] While it may be interesting, it's not the final word on how to value the hotel."

C.    The Board's Decision

The Board upheld the assessment. First, the Board noted "an assessor's property assessments generally enjoy the presumption of correctness" and "applicants typically have the burden of establishing by a preponderance of the evidence that the Assessor's valuation was incorrect." Second, the Board concluded the Assessor's income methodology "is an appropriate and permissible approach to determine valuation. Moreover, even if the Board were to reject the Assessor's income approach and use the [ ] cost approach, the preponderance of the evidence supported higher construction costs than those set forth in the [ ] FASB 141 report." As the Board explained, "even if the Board were to determine that the so-called Rushmore Approach were deficient, the balance of the evidence still supported the roll value after adjusting [SHC's] analysis to reflect increased construction costs."

In reaching this conclusion, the Board rejected SHC's argument that the "'Rushmore Approach'" utilized by the Assessor "improperly included intangible property." The Board noted it understood the "criticism of the Rushmore Approach," but concluded "the evidence and testimony presented at [the] hearing did not persuade [it] to

9

reject its application to the . . . [p]roperty in the instant case.  As noted above, the balance of testimony was that potential purchasers of the [p]roperty would generally utilize the Rushmore Approach, or a substantially similar approach in determining value.  Further, while [SHC] contended that a better approach would be to capitalize the rent that a typical vendor would pay to lease space in the hotel, [SHC] did not present any such evidence for the Board to consider."

Third, the Board determined the FASB 141 allocation proffered by SHC may be "acceptable for financial reporting purposes" but did not "provide an accurate 'appraisal' for property tax purposes" and that SHC's "testimony and evidence at [the] hearing was insufficient to persuade the Board to concur with [SHC']s opinion of value.  The Board instead found that the balance of the evidence supported the Assessor's opinion of value." The Board explained it "was not convinced that FASB 141 reports may be utilized in the same manner as an appraisal prepared for California property tax purposes" in part because SHC did not present "credible evidence that the requirements for such reports are the same as those for property tax purposes."  Additionally, the Board agreed "with the Assessor's argument that goodwill in the instant case should be $0 as opposed to $14.15 million in light of the fact that the management and/or franchise fees would largely capture that goodwill for the benefit of the Ritz-Carlton Hotel Company, LLC as opposed to [SHC]."  Finally, the Board concluded the Assessors' Handbook provides guidance to County Assessors and "is not binding upon them. [¶] On balance, the Board finds that the Assessor's proposed income methodology is an appropriate and permissible approach to determine valuation."  The Board affirmed the assessment of $116,980,000.

*SHC's Trial Court Action for a Property Tax Refund*

In a verified complaint seeking a property tax refund, SHC alleged: (1) the Board failed to exclude intangible assets from the valuation; (2) the Board erred by placing the burden on SHC to show the assessment was incorrect; (3) the assessment failed to comply with federal and California constitutional law; and (4) the Board's findings failed to include a determination of unidentified "material points" SHC raised at the hearing.

The complaint sought a refund of taxes paid and a remand to the Board for a redetermination of property value.

Following a bench trial, the court issued a statement of decision upholding the Board's decision. Relying on *EHP Glendale, LLC v. County of Los Angeles* (2011) 193 Cal.App.4th 262, 272 (*EHP Glendale*), the court concluded the income approach was a valid method for determining property value. As the court explained, "the Assessor selected the *Rushmore* method to sufficiently account for and isolate the income stream attributable to the taxable real property. . . . The *Rushmore* approach is widely used to appraise hotel real property for either lending or tax purposes." The court then determined there was substantial evidence supporting the Board's conclusion that the assessment "excluded non-taxable intangible value."

Next, the court determined the assessment was "made in accordance with law" and the Board's "decision upholding the Assessor's enrolled value for the property fully complie[d] with the requirements" of the Revenue and Taxation Code. According to the court, "[t]he Assessor properly performed his duties in assessing the real property and there is substantial evidence in the record to support the [Board's] conclusion that he did. The Assessor presented evidence of its analysis utilizing all three methods authorized by statute to determine the fair market value of the property. The Assessor provided a comprehensive analysis of each method including details of the parcels at issue, comparable sales of luxury hotels nationwide, Marshall & Swift cost estimates, a discounted cash flow analysis and historical costs, background articles on the valuation of hotels as income producing properties, a position paper by the California Assessors' Association on excluding intangible value from income producing properties by the Rushmore approach, expert opinion, and legal analysis and briefing regarding the propriety of the . . . assessment. There is nothing in the record to indicate the assessment is contrary to law."

Additionally, the court rejected SHC's claim that the Assessor's failure to follow the Assessors' Handbook was contrary to law. The court concluded the Assessors' Handbook was "not mandatory" but rather "a set of recommendations for how to value

11

property." (Fn. omitted.) Finally, the court rejected SHC's argument that the Board improperly placed the burden of proof on SHC, as well as SHC's claim that the Board failed to address all "material points raised" by SHC at the evidentiary hearing before the Board. The court entered judgment for the County.

## DISCUSSION

To place the issues in context, we review "preliminary considerations which are not in dispute or are at least we think well settled, but which require our brief recitation before approaching the central issue of this case." (*Service America Corp. v. County of San Diego* (1993) 15 Cal.App.4th 1232, 1234 (*Service America*).)

### I.
### *General Taxation Principles and Principles Related to Taxation of Intangible Property*

As we have already stated, "the California Constitution requires generally the assessment of property at 'fair market value' . . . [A]ssessors have a constitutional mandate to tax all property at fair market value if not exempt under federal or state law. [Citations.]" (*Elk Hills, supra,* 57 Cal.4th at pp. 606-607.) "Fair market value means 'the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used." (*Ibid.,* quoting § 110, subd. (a).)

Intangible property, however, is "exempt from taxation" pursuant to section 212, subdivision (c), which "broadly exempts intangible assets and rights from taxation." (*Elk Hills, supra,* 57 Cal.4th at p. 607.) Section 212 "provides, 'Intangible assets and rights are exempt from taxation and, except as otherwise provided in the following sentence, the value of intangible assets and rights shall not enhance or be reflected in the value of taxable property." (*Ibid.*) But section 212 also provides that "[t]axable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to

12

put the taxable property to beneficial or productive use.' [Citation.]" (*Elk Hills, supra,* 57 Cal.4th at p. 607.)

Section 110 "provides rules of construction that harmonize section 212(c)'s tax exemption with the command that assessors tax all property at its fair market value." (*Elk Hills, supra,* 57 Cal.4th at p. 607.) "[S]ection 110(d)(1) and (2) prevents the direct taxation of intangible rights and assets when assessors use methods of unit valuation. Section 110(d)(1) prevents tax assessors from including the value of intangible assets that relate to the going concern value of a business within the unit value of property prior to assessment. Section 110(d)(2) requires taxing authorities to value intangible assets and actively remove that value from a unit's taxable base value, so that the intangibles are not directly taxed." (*Elk Hills,* at p. 608.) "The procedures in section 110(d) operate in conjunction with section 110(e). [Citation.] . . . [¶] Section 110(e) provides: 'Taxable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use.'" (*Elk Hills,* at p. 608.) "Section 110(e) applies to intangible assets or rights that are 'necessary' to the beneficial or productive use of taxable property." (*Elk Hills,* at p. 608.)

Put another way, "[s]ection 110(d)(1) prevents *the value* of intangible assets from enhancing or being reflected in the valuation of taxable property. Section 110(e) allows assessors to enhance the valuation of taxable property, not by including *the value* of intangible assets in the valuation . . . but simply by *assuming the presence* of intangible assets when valuing the taxable property put to beneficial or productive use." (*Elk Hills, supra,* 57 Cal.4th at p. 615.) As our high court has explained, "assessors cannot tax *the value* of intangible assets directly . . . but that principle does not prevent assessors from assuming the presence of intangible assets when valuing *taxable property*. . . . In other words, assessors must do their constitutional duty to assess taxable property at fair market value . . . while making sure that the value of intangible assets is not improperly subsumed within the value of taxable property. . . ." (*Id.* at p. 614.)

"The taxability of intangibles has long been a subject of controversy between assessors and taxpayers." (Ehrman & Flavin, Taxing Cal. Property (4th ed. 2013) § 4:4,

p. 4-4 (Taxing Cal. Property).)  In 1998, and in "an effort to resolve the controversy," the State Board of Equalization adopted the Assessors' Handbook, "a 15-page statement of its position" on the taxability of intangible property, to provide instruction to county assessors.  The discussion on intangibles "is the most controversial part of the handbook. . . . ." (Taxing Cal. Property, *supra*, § 4:4, p. 4-9; see also § 32:4, p. 32-167.)  The Assessors' Handbook provides in pertinent part: "The value of intangible assets and rights cannot be removed by merely deducting the related expenses from the income stream to be capitalized.  Allowing a deduction for the associated expense does not allow for a return on the capital expenditure.  For example, allowing the deduction of wages paid to a skilled work force does not remove the value of the work force in place from the income indicator, because the amount of the wages paid does not necessarily represent a return of and on the work force in place, and further bears no relationship to the costs associated with locating, interviewing, training and otherwise acquiring the work force. Similarly, the deduction of a management fee from the income stream of a hotel does not recognize or remove the value attributable to the business enterprise that operates the hotel."  (Assessors' Handbook, *supra,* at p. 162, fns. omitted.)

Tax assessors use the Assessors' Handbook "as a basic guide[.]"  (*Exxon Mobil Corp. v. County of Santa Barbara* (2001) 92 Cal.App.4th 1347, 1353 & fn. 2 (*Exxon Mobil*).)  "[A]ssessors' handbooks are not regulations and do not possess the force of law," but "they serve as a primary reference and basic guide for assessors, and have been relied upon and accorded great weight in interpreting valuation questions.  [Citation.]" (*Sky River, supra,* 214 Cal.App.4th at p. 735; see also *Watson Cogeneration Co. v. County of Los Angeles* (2002) 98 Cal.App.4th 1066, 1070, fn. 2.)  The California Supreme Court cited the Assessors' Handbook with approval in *Elk Hills, supra,* 57 Cal.4th at pages 616, and 620 through 621.

## II.
### *The Income Method of Determining Property Value*

Of the three appraisal methods, the Assessor used the income method to determine the hotel's value, "which is described in . . . Rule 8."  (*Sky River, supra,* 214 Cal.App.4th

14

at p. 726, fn. omitted; see fn. 2, *ante*.)  Rule 8 describes two general methods for estimating future income.[7]  As relevant here, the second method uses "income from operating a property" — or business operating income — so long as sufficient income is excluded "to provide a return on working capital and other nontaxable operating assets and to compensate unpaid or underpaid management."  (Cal. Code. Regs., tit. 18, § 1.)

"'Under the income method the assessor capitalizes the sum of future income attributable to the property, less an allowance for the risk of partial or no receipt of income [citation].  The income method rests upon the assumption that in an open market a willing buyer of the property would pay a willing seller an amount approximately equal to the present value of the future income to be derived from the property.'  [Citation.]" (*Olen Commercial Realty Corp. v. County of Orange* (2005) 126 Cal.App.4th 1441, 1446; see also *De Luz Homes v. County of San Diego* (1955) 45 Cal.2d 546 (*De Luz Homes*) [property's value under the income method is "'the sum of anticipated future installments of net income from the property, less an allowance for interest and the risk of partial or no receipt'"]; *Sky River, supra,* 214 Cal.App.4th at p. 726, quoting *Freeport-McMoran Resource Partners v. County of Lake* (1993) 12 Cal.App.4th 634, 642 (*Freeport*) [describing income method].)

III.

*The De Novo Standard of Review Applies*

The parties "dispute whether this court should employ a de novo or substantial evidence standard of review."  (*Freeport, supra,* 12 Cal.App.4th at p. 640.)  Our high

---

[7]     Rule 8(e) provides: "Recently derived income and recently negotiated rents or royalties (plus any taxes paid on the property by the lessee) of the subject property and comparable properties should be used in estimating the future income if, in the opinion of the appraiser, they are reasonably indicative of the income the property will produce in its highest and best use under prudent management.  Income derived from rental of properties is preferred to income derived from their operation since income derived from operation is the more likely to be influenced by managerial skills and may arise in part from nontaxable property or other sources.  When income from operating a property is used, sufficient income shall be excluded to provide a return on working capital and other nontaxable operating assets and to compensate unpaid or underpaid management."  Rule 8(e) is binding on assessors and the Board.  (Cal. Code. Regs., tit. 18, § 1.)

15

court recently summarized the applicable standards of review: "'When the assessor utilizes an approved valuation method, his factual findings and determinations of value based upon the appropriate assessment method are presumed to be correct and will be sustained if supported by substantial evidence.' [Citations.] However, where the taxpayer attacks the validity of the valuation method itself, the issue becomes a question of law subject to de novo review." (*Elk Hills, supra,* 57 Cal.4th at p. 606.) Numerous courts have restated this well-settled law but have struggled to determine whether "a challenge is to 'method' or 'application'" (*Freeport, supra,* 12 Cal.App.4th at p. 640) and have noted it can be "difficult to distinguish between the two types of challenges." (*GTE Sprint, supra,* 26 Cal.App.4th at p. 1001.)

SHC characterizes the issue as a challenge to the *validity* of the income method at issue here and urges us to apply a de novo standard of review. According to SHC, the Assessor's failure to remove the value of intangible assets from the assessment "presents a question of valuation methodology, which is a legal issue subject to . . . independent review." We agree. SHC's contention "goes to the *methodology* used" by the Assessor and approved by the Board and, as a result, "the appeal presents a question of law." (*Main & Von Karman Associates v. County of Orange* (1994) 23 Cal.App.4th 337, 342.)

Numerous cases support our conclusion. (*Sky River, supra*, 214 Cal.App.4th at p. 731; *Exxon Mobil, supra,* 92 Cal.App.4th at p. 1352 [reviewing claim that the Board used "the wrong valuation methodology" de novo]; *GTE Sprint, supra,* 26 Cal.App.4th at p. 1001 [treating taxpayer's attack on "the validity of the valuation methods used, alleging the Board improperly included the value of nontaxable, intangible property . . . as an issue of law"]; *Service America*, *supra,* 15 Cal.App.4th at p. 1235 ["whether the assessor erred by including in his valuation of assets the value of Service America's going business" was an issue "of law"]; *County of Orange v. Orange County Assessment Appeals Bd. No. 1* (1993) 13 Cal.App.4th 524, 529 (*County of Orange*) [attack "directed at the Board's method of valuation" subject to de novo review]; *County of Stanislaus v. Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1450 (*County of Stanislaus*) [same].)

16

Two cases are instructive. (*Sky River, supra,* 214 Cal.App.4th 720; *Elk Hills, supra,* 57 Cal.4th 593.) In *Sky River*, the assessor used the income approach to value the taxpayers' "wind farm electricity generation facilities." The assessment appeals board upheld the assessor's property valuation and the taxpayers "filed actions in the superior court" for a partial property tax refund, arguing the "assessor overvalued the property." (*Sky River,* at p. 725.) The trial court found in favor of taxpayers, concluding the assessor "used a flawed methodology in calculating the value of the property, resulting in an inflated value and an overstated tax." (*Ibid.*) The County appealed, arguing "the trial court should have deferred to the board's findings of fact and should have reviewed the decision only to ascertain whether it was supported by substantial evidence." The taxpayers, however, claimed a de novo standard of review applied on appeal because "the dispute relate[d] to one element of the methodology—the appropriate income tax rate to apply to the conversion—rather than to factual matters." (*Id.* at p. 728.)

The *Sky River* court applied a de novo standard of review. (*Sky River, supra,* 214 Cal.App.4th at pp. 728, 728-730.) It explained: "plaintiffs in this case contend the assessor used an improper method to calculate the value of their property and the amount of their tax. Plaintiffs contend that, although the assessor correctly chose the income approach to determine value, and the band-of-investment method to calculate the capitalization rate, he improperly used an estimated average income tax rate, rather than the marginal rate prescribed by the assessor[s'] handbook, when converting the discount rate from an after-tax rate to a before-tax rate. We conclude that plaintiffs are correct, and the issue presented constitutes a question of law as to an element of the chosen method to be used in calculating the market value of the property. Which income tax rate should be used . . . is a question about the method of calculating the appropriate conversion rate. . . . Determining which rate should be used does not present a question about the facts specific to plaintiffs' case or the data to insert when calculating the value of the property. Rather, it presents a question about the methodology prescribed by [State Board of Equalization] rules for calculation of the property value." (*Id.* at p. 731.)

17

The California Supreme Court reached a similar conclusion in *Elk Hills* and applied a de novo standard of review to analyze a taxpayer's claim that the State Board of Equalization improperly taxed intangible assets and rights, including emission reduction credits (ERCs), when it assessed the taxpayer's electric power plant. (*Elk Hills, supra,* 57 Cal.4th at pp. 601-602.) The *Elk Hills* court explained, "[b]ecause Elk Hills challenges the Board's methodology that includes the value of the ERCs in its unitary valuation of the power plant, the issue here is a question of law." (*Id.* at p. 606.) Here as in *Sky River* and *Elk Hills*, SHC challenges the Assessor's "methodology that includes the value of [intangible assets] in its valuation of [the property]." As a result, "the issue here is a question of law." (*Elk Hills, supra,* 57 Cal.4th at p. 606; *Sky River, supra,* 214 Cal.App.4th at p. 731.)

Relying on *EHP Glendale, supra,*193 Cal.App.4th 262, the County contends the substantial evidence standard of review applies because SHC's challenge is to the *application* of a valid methodology.[8] We are mindful "courts have expressly approved the income method of valuation for property tax purposes" (Taxing Cal. Property, *supra*, § 17:15, p. 17-33-17-34, citing *De Luz Homes, supra,* 45 Cal.2d 546), and we do not disagree with the abstract proposition that the income approach is an acceptable valuation method. We are not persuaded, however, by the County's argument. Here, SHC "attacks the validity of the valuation methods used, alleging the [Assessor] improperly included the value of nontaxable, intangible property, and we treat this as an issue of law." (*GTE Sprint, supra,* 26 Cal.App.4th at p. 1001.) "By challenging the validity of the premise upon which the [Assessor] relied in reaching its decision," SHC "has presented this court with a question of law." (*County of Stanislaus*, *supra,* 213 Cal.App.3d at p. 1450.)

---

[8]     At the hearing before the Board, counsel for the County seemed to agree with SHC that the "proper way to frame [the issue] is the methodology by which you assess a hotel[.]" County counsel explained the question of whether the assessment deducted the value of intangible assets "really depends on what the methodology is" and noted, "the Assessor's position is basically [a] methodology issue and . . . we do not agree with [SHC']s methodology."

Second, the County's reliance on *EHP Glendale* is misplaced.[9] In *EHP Glendale*, Eagle, a hotel owner, filed an action for a property tax refund. In the trial court, Eagle argued "the assessor and Board failed to appropriately consider and remove the value of the hotel's franchise license agreement, the workforce in place and other claimed intangibles in determining the cash value of the hotel upon transfer." The trial court granted summary judgment for Eagle, concluding the assessor and assessment appeals board used the wrong methodology to appraise the hotel. (*EHP Glendale*, *supra*, 193 Cal.App.4th at p. 271.) The County of Los Angeles appealed and the *EHP Glendale* court reversed, determining the trial court erred by granting summary judgment "based on a fragmentary record." (*Id.* at p. 272.) The *EHP Glendale* court rejected Eagle's "claim that the assessor and Board employed an 'invalid appraisal methodology'" presented "an issue of law." (*Id*. at p. 271.) The *EHP Glendale* court rejected this argument. It stated: "[t]he assessor in this case applied an income approach to value the hotel. The income approach is a valid methodology for determining full cash value. [Citations.] Eagle's contention that the assessor improperly applied the income approach by not deducting intangibles presents a question of fact." (*Id.* at p. 272.)

*EHP Glendale* is distinguishable because it concerned an appeal from the grant of summary judgment, which as the court itself explained, "call[s] for the weighing of facts[.]" (*EHP Glendale, supra,* 193 Cal.App.4th at p. 273.) As such, the *EHP Glendale* court's holding was limited to whether summary judgment was appropriate where an incomplete record suggested there were triable issues of fact; the court's statement regarding the validity of the income approach is dicta. (*Dammann v. Golden Gate Bridge, Highway & Transportation Dist.* (2012) 212 Cal.App.4th 335, 354.) We have no quarrel with *EHP Glendale*'s statement that "the income approach is a valid methodology

---

[9] The County also relies heavily on *EHP Glendale, LLC v. County of Los Angeles*, a case depublished by the California Supreme Court after the County filed its brief. (Previously published at 219 Cal.App.4th 1015, ordered nonpub. Dec. 18, 2013 (S214290).) The County cites, but does not discuss, *Elk Hills, supra,* 57 Cal.4th 593, and does not explain why we should not be bound by the standard of review articulated in that case pursuant to *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.

for determining full cash value" but we are not bound by that court's summary conclusion that the assessor's failure to deduct intangibles in that case "present[ed] a question of fact." (*EHP Glendale*, *supra*, 193 Cal.App.4th at p. 272.)

As we have explained, where — as here — the taxpayer contends "the challenged method will produce systematic errors if applied to properties in that class, the issue is not factual but legal. The issue is not whether the assessor misunderstood or distorted the available data, but whether he or she chose an appraisal method which by its nature was incapable of correctly estimating market value." (*Union Pacific Railroad Co. v. State Bd. of Equalization* (1991) 231 Cal.App.3d 983, 992 (*Union Pacific*); see also *American Sheds, Inc. v. County of Los Angeles* (1998) 66 Cal.App.4th 384, 391 [de novo review applies where assessing authority "adopt[s] a position concerning the inclusion or exclusion of intangibles, which [can] be tested as a matter of law against pertinent authority"].)

IV.

*The Assessor's Methodology Improperly Assessed*
*Certain Intangible Assets and Rights*

Having determined the de novo standard of review applies, we turn to the question in this case: whether the income approach used here properly identified and excluded intangible assets prior to the assessment as required by California law. As we explain below, the deduction of the management and franchise fee from the hotel's projected revenue stream pursuant to the income approach did not — as required by California law — identify and exclude intangible assets such as the hotel's assembled workforce, the hotel's leasehold interest in the employee parking lot, and the hotel's agreement with the golf course operator. (See *Elk Hills, supra,* 57 Cal.4th at pp. 618-619 & authorities cited therein.) The deduction of the management and franchise fee did, however, exclude the intangible asset of goodwill.

The Assessor's expert, Callahan, conceded the Assessor's approach did not remove all intangible assets and rights. His report stated "the *majority* of the property's business value has been removed through the deduction of the management fee" and

20

acknowledged that "[i]n addition to the deduction of market rate management and franchise fee, the capitalized value of pre-opening expenses (e.g. the cost of assembling and training a work force, pre-opening marketing, etc.) necessary to open the business is *also often deducted* as an intangible value of the hotel." (Italics added.) At the evidentiary hearing before the Board, Callahan conceded the deduction of the management and franchise fee accounted for the "majority. Not all, but by in large, the majority" of intangible property. Callahan admitted "other components" such as "labor in place" "should be deducted" in addition to the management and franchise fee. Later, Callahan elaborated: "[a]nother argument . . . is also deducting the capitalized value of the labor in force, pre-opening expenses and working capital. [¶] For a property of this caliber, that would probably be about $6,000 per guest room. . . . So . . . the question is [whether] the majority of the business value is taken out in the management and franchise fee. It's either a hundred percent or it's like ninety percent. [¶] There's an argument that I think is worthy of making of taking off an additional item. . . . Not the goodwill line item for 14 million dollars, but . . . a million dollars for labor in place. . . . But it's relatively small dollars when we're talking about a hotel of this caliber."

Callahan's report and testimony before the Board demonstrate the methodology used by the Assessor and approved by the Board "failed to attribute a portion of [the hotel's] income stream to the enterprise activity that was directly attributable to the value of intangible assets and deduct that value prior to assessment." (*Elk Hills, supra,* 57 Cal.4th at p. 618.) As a result, the methodology was "legally incorrect." (*Sky River, supra,* 214 Cal.App.4th at p. 737.) Our conclusion is consistent with a long line of authority — culminating with *Elk Hills* — requiring intangible assets and rights that directly enhance a property's income stream to be separately identified and "deducted from the income stream analysis prior to taxation." (*Elk Hills, supra,* 57 Cal.4th at p. 619; § 110, subds. (d)(1), (d)(2); *GTE Sprint, supra,* 26 Cal.App.4th at pp. 1004, 1007; *Service America, supra,* 15 Cal.App.4th at pp. 1240-1242 [assessor erred in using entire income flow earned by franchisee ballpark concession company]; *Shubat v. Sutter County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 794, 804 [assessor erred by failing to

21

exclude value of cable television company's intangible assets, such as right to conduct business, subscriber list, and going concern]; *County of Orange, supra,* 13 Cal.App.4th at pp. 532-534 [assessor's valuation of cable television system failed to exclude value of intangibles that enhanced value of business, e.g., existing franchises, licenses to construct, goodwill]; *County of Los Angeles v. County of Los Angeles Assessment Appeals Bd.* (1993) 13 Cal.App.4th 102, 111-113 [assessment of airport car rental concession based on capitalized fees improperly included value of intangibles such as the right "to do business"]; see also Assessors' Handbook, *supra,* at p. 162.)  The County does not discuss, or attempt to distinguish, these cases.

*GTE Sprint* is instructive.  There, the appraiser used several approaches, including the income approach, to value stock held by GTE Corporation in its subsidiary, Sprint. (*GTE Sprint, supra,* 26 Cal.App.4th at pp. 995-996.)  In a petition for reassessment, Sprint argued the Board "impermissibly included the value of the following nontaxable intangible assets: the Sprint trade name; customer base; assembled workforce; favorable broadband leases of transmission capacity from other carriers; favorable property leases; advertising agency relationships; favorable debt financing contracts; inventory of advertising materials; and the benefit of avoiding significant start-up costs by purchasing a going concern, which Sprint identified as goodwill and other intangible assets."  (*Id.* at p. 998.)  Sprint contended "the Board's method of appraisal was fundamentally flawed because it made no allowance for the values of the nontaxable, intangible assets as California law requires. . . . Sprint argue[d] that its fair market value contained both tangible and intangible assets and the Board attributed virtually the entire fair market unit value of its California property solely to its tangible (taxable) property, without making proper allowances for its nontaxable, intangible assets."  (*Id.* at p. 999.)

A division of this court agreed, concluding "the Board erred by actively ignoring Sprint's evidence of separate intangible assets. . . ."  (*GTE Sprint, supra,* 26 Cal.App.4th at p. 1001.)  The court explained, "the Board's appraisers are required by law to identify and value intangible assets, if any, and exclude these values from the appraisal of the taxpayer's property.  The Board's own appraisers admitted that they did not attempt to

identify any intangible assets, but instead ignored the detailed evidence produced by Sprint, which identified and separately valued numerous intangible assets." (*Id.* at p. 999.) The *GTE Sprint* court continued, "In our view the Board and its appraisers erred in assuming that unit valuation, especially when calculated by the [income] method, necessarily taxes only the intangible values as they enhance the tangible property. This absolutist approach obscures the Board's duty to exclude intangible assets from assessment." (*Id.* at p. 1004.)

The same is true here. As in *GTE Sprint*, the Assessor and the Board ignored SHC's credible evidence in the form of Gavin's report and his testimony at the evidentiary hearing that certain intangible assets — i.e., the hotel's workforce, the hotel's leasehold interest in the employee parking lot, and the hotel's agreement with the golf course operator — were "necessary to the beneficial or productive use of the property" and "that the fair market value of those assets [was] improperly subsumed in the valuation." (*Elk Hills, supra*, 57 Cal.4th at p. 615.)

We disagree with the County's claim that "the intangible value was removed by deducting the management and franchise fee[.]" The Assessor removed the management and franchise fee from the hotel's income stream, but did not explain how that deduction captured the "majority" of intangible property. Moreover, the Assessor's expert conceded the deduction of the management and franchise fee did not account for all of the intangible value of the property, and admitted other intangible assets "should be deducted[.]" The Assessor's reliance on the deduction of the management and franchise fee — and its refusal to identify and value certain intangible assets — is akin to paying "lip service to the concept of exempting intangible assets from taxation[,]" a practice condemned in *GTE Sprint*. (*GTE Sprint, supra,* 26 Cal.App.4th at p. 1005.)

We are not persuaded, however, by SHC's claim that the income method at issue here is invalid for the additional reason that it failed to exclude goodwill. As our Supreme Court has held, "goodwill of a business" is an intangible asset "that must be deducted from an income stream analysis prior to taxation." (*Elk Hills, supra*, 57 Cal.4th at pp. 618-619; *GTE Sprint, supra,* 26 Cal.App.4th at p. 1004.) It is undisputed an

23

assessor's property assessment generally enjoys the presumption of correctness and SHC had the burden of establishing by a preponderance of evidence the assessor's valuation was incorrect. (Cal. Code Regs., tit. 18, § 321.) "Courts have long presumed that the Board assesses all property correctly, placing on the taxpayer the burden of proving that an assessment is incorrect." (*Trailer Train Co. v. State Bd. of Equalization* (1986) 180 Cal.App.3d 565, 584.)

At the evidentiary hearing before the Board, there was a factual dispute about the value of goodwill. SHC argued the value of goodwill was $14,150,000 using the residual approach identified by Gavin. In contrast, the Assessor calculated the value of goodwill at $0 and offered the testimony of Hunter and Callahan demonstrating the Assessor identified and quantified the value of goodwill in the amount attributed to the management and franchise fee. In this way, the Assessor deducted the value of goodwill from the hotel's income stream prior to taxation. Here, the Board was presented with "a question about . . . the data to insert when calculating the value of the [goodwill]." This was a "question of fact to be determined by the [B]oard on the evidence presented." (*Sky River, supra,* 214 Cal.App.4th at p. 731.) The Board resolved this factual dispute in favor of the Assessor, agreeing "with the Assessor's argument that goodwill in the instant case should be $0 as opposed to $14.15 million in light of the fact that the management and/or franchise fees would largely capture that goodwill for the benefit of the Ritz-Carlton Hotel Company, LLC as opposed to [SHC]." Reviewing the Board's resolution of this factual dispute for substantial evidence (*Elk Hills, supra,* 57 Cal.4th at p. 606), we cannot conclude substantial evidence did not support the Board's finding on this issue. There may be situations where the taxpayer can establish the deduction of a management and franchise fee from a hotel's income stream does not capture the intangible asset of goodwill, but SHC, the taxpayer, has failed to do so here.

We conclude the Assessor's valuation of the hotel failed to exclude certain intangible assets in violation of section 110, subdivision (d)(1), which prohibits an assessor from using the value of intangible rights and assets to enhance the value of taxable property, and section 110, subdivision (d)(2) which requires "the fair market

24

value of those assets . . . be removed pursuant to section 110(d)(2)." (*Elk Hills, supra,* 57 Cal.4th at p. 615; see also § 212, subd. (c).) Having reached this result, we decline to address SHC's other claims of error.

## DISPOSITION

The judgment of the trial court is reversed. The trial court is directed to enter a new and different judgment in favor of SHC and against the County, determining the method used by the Assessor and approved by the Board to calculate the value of the property violated the standards prescribed by law because it failed to identify, value, and remove the value of the following intangible assets and rights from the hotel's income stream prior to taxation: (1) the hotel's workforce; (2) the hotel's leasehold interest in the employee parking lot; and (3) the hotel's agreement with the golf course operator. The trial court shall remand the matter to the Board to recalculate the value of the property applying the income method consistent with the views expressed in this opinion. As SHC suggested at oral argument, "a de novo hearing before the Board" on these intangible assets is "not necessary because '[a]ll of the facts necessary to compute the proper valuation are in the record.'" (*Union Pacific, supra,* 231 Cal.App.3d at p. 1001.)

Each party is to bear its costs on appeal. (Cal. Rules of Court, rule 8.278.)

_____

Jones, P.J.

We concur:

_____

Simons, J.

_____

Needham, J.

Superior Court of the County of San Mateo, No. CIV499595, John W. Runde, Judge.

Cahill, Davis & O'Neall LLP, C. Stephen Davis, Cris K. O'Neall and Andrew W. Bodeau for Plaintiff and Appellant.

John C. Beiers, County Counsel and Rebecca M. Archer, Deputy County Counsel, for Defendant and Respondent.

A137218