Filed 6/26/20; Certified for Publication 7/16/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MARK CHURCH, as County Assessor, etc.,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>SAN MATEO COUNTY ASSESSMENT APPEALS BOARD,<br><br>　　　Defendant and Respondent;<br><br>GENENTECH, INC.,<br><br>　　　Real Party in Interest and Appellant. | A155034<br><br>(San Mateo County<br>Super. Ct. No. 16-CIV-01058) |

　　　Genentech, Inc. (Genentech) appeals a writ of mandate overturning a decision of the San Mateo County Assessment Appeals Board (the appeals board) which invalidated escape assessments imposed by the San Mateo County Assessor (the assessor) based on the value of machinery and equipment (M&E) at Genentech's San Mateo County facility. The fair market value of the M&E on which property tax is imposed is determined with reference to either the cost of equipment purchased in a finished state or, if the equipment is not purchased in a finished state, costs incurred to bring the equipment to a finished state, including the cost of labor and materials plus certain additional costs such as the costs of actual or implied financing, debugging, and engineering. Based on substantial evidence, the appeals board determined that Genentech purchased all of the M&E in question in a finished state, and that the assembly of these pieces of equipment into a production line did not render the equipment "self-constructed property" justifying inclusion of the additional costs in determining fair market value of the equipment. In

1

disregard of the appeals board's factual findings, the trial court determined that none of the equipment was in a finished state until put to use in a functioning production line, and that the additional costs capitalized for accounting purposes add to the value of the property for purposes of the property tax. We conclude that the trial court adopted a standard for determining when equipment is in a finished state for which there is no justification, and erroneously rejected the appeals board's findings that are supported by substantial evidence. We agree with the appeals board that fair market value and net book value are separate concepts with separate purposes, and that the assessor may not rely on Genentech's capitalization of expenses for accounting purposes to establish that those expenses increase the value of the equipment and are subject to assessment. Accordingly, we shall reverse the judgment and direct the trial court to enter a new judgment denying the assessor's petition for writ of mandate.

Because the trial court ruled in the assessor's favor with regard to the valuation of Genentech's M&E and remanded the matter to the appeals board for recalculation of the fair market value of Genentech's M&E, the court did not address the assessor's separate cause of action regarding the calculation of the fair market value of Genentech's laboratory and manufacturing fixtures. The trial court concluded that any issue regarding that calculation could be addressed before the appeals board on remand. Accordingly, we shall reverse the judgment and remand with directions that the trial court address in the first instance the assessor's cause of action regarding Genentech's fixtures and deny the petition as to the remaining causes of action.

**Background**

A.  *Legal Background*

In California, personal property used in a business is taxable unless exempt. (Cal. Const., art. XIII, § 1.) All taxable personal property must be assessed at its "fair market" or "full cash" value. (Cal. Const., art. XIII, § l; Rev. & Tax Code, § 110, subd. (a).) State law requires Genentech to file an annual statement reporting its taxable personal property. The assessor, in turn, is required to audit Genentech's "books and

2

records" at least once every four years. (Rev. & Tax Code, § 469, subds. (a), (b)(1)(B).) If a taxpayer's books and records reveal taxable personal property that has not been reported on the taxpayer's annual statement, the assessor issues an escape assessment for the unreported property. (Rev. & Tax Code, § 532.)

"The Legislature has authorized the state's Board of Equalization to prescribe rules and regulations to govern the operation and functioning of local tax assessors and boards of equalization. [Citation.] Those regulations are found in the California Code of Regulations, title 18." (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 836, fn. 1.) According to the regulations, "the words 'full value', 'full cash value', 'cash value', 'actual value', and 'fair market value' mean the price at which a property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would transfer for cash or its equivalent under prevailing market conditions." (Cal. Code Regs., tit. 18, § 2(a).) The parties agree that the fair market value of the equipment at issue should be determined by using the cost method prescribed by California Code of Regulations, title 18, section 6 (hereafter, Rule 6). Under section (b) of Rule 6, the assessor assesses the property by either "(1) adjusting the property's original cost for price level changes and for abnormalities, if any, or (2) applying current prices to the property's labor and material components, with appropriate additions for entrepreneurial services, interest on borrowed or owner-supplied funds, and other costs typically incurred in bringing the property to a finished state (or to a lesser state if unfinished on the lien date)."

The state Board of Equalization issues a handbook to "serve as a primary reference and basic guide for assessors." (*Sky River LLC v. County of Kern* (2013) 214 Cal.App.4th 720, 735; *SHC Half Moon Bay v. County of San Mateo*, *supra*, 226 Cal.App.4th at p. 485.) Section 504 of the handbook provides guidance for valuing property under Rule 6. (Bd. of Equalization, Assessors' Handbook (Jan. 2015), Assessment of Personal Property and Fixtures <http://www.boe.ca.gov/proptaxes/pdf/ah504.pdf> [as of May 27, 2020] (assessors' handbook).) It explains, "Cost for assessment purposes may be thought of as *full*

3

*economic cost*. Full economic cost should include all market costs, both direct and indirect, necessary to purchase or construct equipment and make it ready for its intended use. Costs which add value, direct and indirect, associated with manufacturing the equipment and/or making it ready for its intended use should be included in the full economic cost. Not all costs add value, for example, relocation costs are not costs contributing to the assessable value of the property. *Direct costs*, or 'hard' costs, are expenditures for the labor, materials, and direct factory overhead required to construct the property whether purchased in the form of raw materials or a finished product. *Indirect costs*, or 'soft' costs, include expenditures other than labor and material necessary to make the equipment ready for its intended use." (*Id.* at p. 53.) The assessors' handbook includes a chart that differentiates between indirect costs that should be included in the value of "purchased equipment" and those indirect costs that should be included in the value of "self-constructed equipment." (*Id.* at p. 54.) Capitalized interest, debugging expenses and engineering fees are all examples of costs that should be included in assessing self-constructed property but not purchased property. (*Ibid.*) For example, with respect to capitalized interest the assessors' handbook explains, "Self-constructed property, property constructed by the user and put to productive use in that business, has an interest cost associated with it regardless of whether the source of funds is debt or equity and whether or not the interest is actually incurred. Therefore, an increment of interest must be identified and included when valuing self-constructed property. This only applies to financing costs during the construction period. Financing costs, actual or imputed, attributable to the holding of the property after the completion of construction, including purchase financing, should not be included in the cost of construction. Care must be taken to include only the interest attributable to the piece of equipment under construction." (*Id.* at pp. 57-58, fn. omitted.)

### B. *Factual and Procedural Background*

Genentech is a biotechnology company that produces various medicines. During the relevant time period, Genentech purchased from various suppliers manufacturing and

storage equipment, including among other things bioreactors (tanks), fermenters, centrifuges, autoclaves, and chromatography columns, all used in the production of the medicines. This equipment was arrayed throughout Genentech's buildings and incorporated in various production lines.

In addition to the purchase price of its M&E, Genentech recorded in its general ledger additional equipment costs (as distinguished from production costs) that were charged as expenses over the life of the equipment. Pursuant to the Statement of Financial Accounting Standards No. 34 (FASB 34), Capitalization of Interest Cost, issued by the Financial Accounting Standards Board (FASB)[1] (<https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1218220130361&acceptedDisclaimer=true> [as of June 25, 2020]), Genentech imputed an interest charge on the equipment as if Genentech had financed the various acquisitions with a loan. Genentech also booked "debugging" costs that were incurred after the installation of equipment to evaluate and monitor the operation of the equipment. Finally, Genentech booked professional and engineering costs that similarly were incurred after installation of the equipment to adjust and test the installed equipment.

Whether these additional costs should be included in determining the value of Genentech's M&E for property tax purposes was the subject of prior litigation. For each

_____

[1] Paragraphs 6 through 8 of FASB 34 read: "STANDARDS OF FINANCIAL ACCOUNTING AND REPORTING [¶] 6. The historical cost of acquiring an asset includes the costs necessarily incurred to bring it to the condition and location necessary for its intended use. If an asset requires a period of time in which to carry out the activities necessary to bring it to that condition and location, the interest cost incurred during that period as a result of expenditures for the asset is a part of the historical cost of acquiring the asset. [¶] 7. The objectives of capitalizing interest are (a) to obtain a measure of acquisition cost that more closely reflects the enterprise's total investment in the asset and (b) to charge a cost that relates to the acquisition of a resource that will benefit future periods against the revenues of the periods benefited. [¶] 8. In concept, interest cost is capitalizable for all assets that require a period of time to get them ready for their intended use (an 'acquisition period'). However, in many cases, the benefit in terms of information about enterprise resources and earnings may not justify the additional accounting and administrative cost involved in providing the information. . . ."

of the tax years between 1990 and 1999, Genentech paid property taxes based on the adjusted purchase costs of its equipment. The assessor, after reviewing Genentech's books and records, issued an escape assessment asserting that the additional costs booked against the equipment in Genentech's general ledger should be included in the assessed value of Genentech's equipment. Genentech appealed the assessments, resulting in three decisions by the appeals board. Ultimately, in 2010, the superior court issued a judgment in favor of Genentech for tax year 1990-1991. In its statement of decision, the court held that capitalized interest should not be included in the assessed value of Genentech's equipment. The court found that Genentech's equipment had been purchased in its finished state, so that "including an additional charge for capitalized interest after the purchase would be improper." The court rejected the assessor's argument that Genentech's assemblage of the equipment into a production line constituted self-construction of that equipment. No appeal was taken and the parties accepted the superior court's ruling in settling the issues for the remaining tax years.

The current proceedings concern tax years 2000-2005, in which the assessor again issued escape assessments asserting that additional costs should be included in the assessed value of Genentech's equipment. Following an extended evidentiary hearing, the appeals board concluded that the additional costs should not be included. The appeals board found that each individual piece of equipment is a distinct marketable item that should be separately appraised, rejecting the assessor's argument that the equipment should be valued collectively as part of a completed production line. Based on its review of the evidentiary record, the appeals board determined that Genentech's equipment was purchased in a finished state and was not self-constructed. According to the appeals board, "the preponderance of the evidence demonstrates that Genentech did not self-construct the M&E at issue. Although evidence was presented that Genentech played a role in directing its contractors to assemble its equipment into a product line, the board was not persuaded that [Genentech] played the role of a 'general contractor' such that [it] can be deemed to have self-constructed its M&E. The board was persuaded that, during the relevant time period for the equipment at issue, [Genentech] did not participate in the

engineering or design of the M&E itself but played a more limited role of giving the necessary specifications to its contractors. . . . The board further notes that the evidence showed that Genentech does not pull its own building permits for its construction. Rather, such permits are instead taken out by Genentech's contractors. Additionally, the board concludes that the preponderance of the evidence supports a finding that [Genentech's] acquisition and installation of such equipment during the 2000-2005 tax years consisted of purchasing the M&E 'in a finished state, ready to use' and that the purported self-construction consisted of the 'assemblage of equipment into a production line.' [Genentech's] witnesses, including James Panek, Genentech's former Senior Vice President of Product Operations, testified that 'Genentech did not self-construct its equipment,' and that its M&E installation practices were consistent during all relevant periods. The board found this testimony persuasive. [¶] The board notes that the assessor did not offer support for his general argument that the mere installation and connection of [Genentech's] equipment constitutes 'self-construction' for the purposes of the applicable law. Rather, the assessor simply opined that one piece of equipment could not function on its own and, therefore, is not in its finished state until it is part of a product line. Additionally, while the assessor argued that the capitalized interest recorded in [Genentech's] fixed asset ledger pursuant to FASB 34 should be included in valid costs, this board was not persuaded that the standards for FASB and the standards for Rule 6 were the same. To the contrary, [Genentech] provided evidence that the calculation of capitalized interest differs under FASB as opposed to Rule 6."[2]

The assessor filed the present petition for writ of administrative mandamus challenging, among other things, the conclusion that amounts described as "capitalized interest" (first cause of action), "start-up and debugging costs" (second cause of action)

---

[2] As discussed, *post*, Genentech presented expert testimony that the scope of FASB 34 is materially broader than that of Rule 6.

and "capitalized labor" (third cause of action) are not assessable as part of the value of Genentech's equipment.[3] The trial court granted the assessor's petition.

The trial court rejected the standard applied by the appeals board in determining whether the additional costs should be included. The court held that whether an asset is "self-constructed" is irrelevant to the determination: "[T]he exact nature of the method by which the property is acquired or brought to a finished state is irrelevant, providing that on the date the property is acquired, the property is not ready for its intended use, and, therefore, that some series of actions or events must occur before the property will reach its finished state. . . . If the criteria is met, i.e. the property is not in a finished state when acquired; the costs of bringing the property to its finished state must be capitalized and included in the assessed valuation." The trial court held that the proper standard to be applied in determining when an asset reaches its "finished state" is when "the asset is placed in service and . . . becomes 'income producing.' " In denying Genentech's motion for new trial, the court clarified that it viewed the equipment as part of an assembly line, not as individual pieces of equipment. The court explained, "In the context of an assembly line constructed to manufacture pharmaceutical products, the assembly line is not in its finished state until it is ready to be placed in service to manufacture pharmaceutical products. If modification must be made or additional costs incurred before that equipment can be placed in service, the assembly line obviously has not reached a finished state. The court's interpretation of Rule 6 is consistent with the typical costs of self-construction cited in the assessors' handbook as including 'other costs required to make equipment ready for its intended use.' "

The trial court's decision goes on at great length to emphasize that Genentech capitalizes the additional expenses and includes the capitalized amounts as equipment

---

[3] The assessor's petition alleged as a fourth cause of action that the appeals board failed to take into account a change in ownership of certain buildings in calculating the assessed value of Genentech's fixtures. This cause of action is largely unrelated to the board's decision regarding assessment of Genentech's M&E and is addressed separately in section 7 of the discussion.

costs in its general ledger, financial statements, income tax returns, and filings with the Securities and Exchange Commission. The court concluded, contrary to the appeals board, that these financial records establish that the additional expenses were incurred to bring the equipment to its finished state.

With respect to capitalized interest, the court held that the criteria for including additional costs in the value of an asset under Rule 6—that is, "costs typically incurred in bringing the property to a finished state," is the same as the criteria under FASB 34 for determining whether interest should be capitalized rather than taken as a current expense. Accordingly, the court considered the inclusion of capitalized interest in Genentech's financial records to "constitute[] an extremely strong evidentiary showing" that these costs were required to ready the equipment for its intended use and added to the value of the equipment.[4] In denying Genentech's motion for a new trial, the court confirmed that "the assessor appeared to have satisfied his prima facie burden under Rule 6 by showing Genentech's own books and records, Securities and Exchange Commission filing and its audited financials all show capitalized interest, labor, and startup and debugging costs were booked to the machinery and equipment account."

Genentech timely filed a notice of appeal.

## Discussion

1. *Standard of Review*

The appeals board is a constitutional agency exercising quasi-judicial powers delegated to it by the California Constitution. (*Shell Western E & P, Inc. v. County of Lake* (1990) 224 Cal.App.3d 974, 979.) The board's " 'factual determinations are entitled on appeal to the same deference due a judicial decision, i.e., review under the substantial evidence standard.' " (*Ibid*.) However, when the appeals board purports to decide a question of law, the decision is reviewed de novo. (*Id*. at p. 980.) "Where the taxpayer

_____

[4] The court even questioned whether the doctrines of judicial estoppel or equitable estoppel would preclude Genentech from offering evidence to rebut the inference drawn from the financial statements.

9

claims a valid valuation method was improperly applied, the trial court is limited to reviewing the administrative record. [Citation.] The court may overturn the assessment appeals board's decision only if there is no substantial evidence in the administrative record to support it. [Citation.] However, where the taxpayer challenges the validity of the valuation method itself, the court is faced with a question of law. In such a case, the court does not evaluate whether substantial evidence supports the board's decision, but rather must inquire into whether the challenged valuation method is arbitrary, in excess of discretion, or in violation of the standards prescribed by law." (*Maples v. Kern County Assessment Appeals Bd.* (2002) 96 Cal.App.4th 1007, 1013; see also *Carlson v. Assessment Appeals Bd. I* (1985) 167 Cal.App.3d 1004, 1009.)

2.      *Issue Preclusion*[5]

Initially, Genentech contends the trial court erred in failing to apply the Superior Court's 2010 Decision and prior final decisions of the appeals board to preclude the assessor from including the additional costs in the assessable value of its M&E. We agree that the trial court properly rejected this argument.

Issue preclusion applies when " 'an issue of ultimate fact' " has been previously and finally decided. (*People v. Santamaria* (1994) 8 Cal.4th 903, 912.) An ultimate fact is one that involves application of law to fact, such as an essential element of a claim or a defense, as distinguished from an evidentiary fact or a legal conclusion. (*Metis Development LLC v. Bohacek* (2011) 200 Cal.App.4th 679, 689.) For an issue to be precluded from relitigation, the following requirements must be satisfied: (1) the issue must be identical to an issue decided in a prior proceeding; (2) the issue must have been actually litigated in the prior proceeding; (3) the issue must have been necessarily decided in the prior proceeding; (4) the decision in the prior proceeding must be final and

_____

[5] In the proceedings below, the doctrine of issue preclusion was referred to as collateral estoppel. We follow our Supreme Court by using " 'issue preclusion' in place of 'direct or collateral estoppel.' " (*Samara v. Matar* (2018) 5 Cal.5th 322, 326; *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.)

on the merits; and (5) the party against whom preclusion is sought must have been a party to or in privity with a party to the prior proceeding. (*People v. Garcia* (2006) 39 Cal.4th 1070, 1077.)

The proper standard to be applied under Rule 6 is a legal question not subject to issue preclusion. (See *Maples v. Kern County Assessment Appeals Bd.*, *supra*, 96 Cal.App.4th at pp. 1012–1013 [validity of the valuation method applied by assessor is question of law.].) The trial court's prior factual determination that Genentech's equipment was purchased in a finished state is also not entitled to preclusive effect because the equipment being valued is not the same equipment that was the subject of the prior proceedings and was not necessarily purchased in the same condition. While the doctrine may apply where an issue has been decided for one set of years and then the same issue is again challenged in a subsequent year (see, e.g., *County of Los Angeles v. County of Los Angeles Assessment Appeals Bd.* (1993) 13 Cal.App.4th 102), the doctrine does not apply where material changes in the controlling facts have occurred during the intervening time period. As the appeals board explained, "With respect to the M&E at issue in the court's statement of decision (i.e., the M&E as of the 1991 lien date), this board agrees that the court has already determined that such equipment was not self-constructed. As such, the collateral estoppel doctrine prohibits the inclusion of capitalized interest in such equipment's cost basis. With respect to Genentech's M&E acquired after 1991, however, it is not as simple as finding that collateral estoppel prevents capitalized interest from ever being included in the M&E's cost basis as Genentech contends. During the 2000-2005 tax years, for example, Genentech could have taken a different approach to installing or connecting its equipment which might constitute 'self-construction.' In other words, the mere fact that [Genentech's] equipment was not self-constructed in one tax year does not automatically require a finding that different equipment in a subsequent year also was not self-constructed." (Underscoring and italics omitted.) The appeals board and the trial court both properly concluded that the issue before us is not governed by the doctrine of issue preclusion.

11

*3.     Unit of Appraisal*

Under the Code of Regulations, the proper unit of appraisal for property tax purposes is that unit which "persons in the marketplace commonly buy and sell as a single unit, or that is normally valued in the marketplace separately from other property, or that is specifically designated as such by law." (Cal. Code Regs., tit. 18, § 324, subd. (b).) As set forth above, the equipment at issue in this case includes a variety of generators, machines, and measuring devices that are arranged throughout Genentech's buildings and used together to produce various medications. Before the appeals board, the assessor argued the equipment would most likely be sold as part of a product line or "as a complete manufacturing facility," so that the proper unit of appraisal is "the entire property." Genentech argued that each individual piece of equipment is a distinct marketable product that should be appraised separately. The appeals board agreed with Genentech, and its finding is supported by substantial evidence. The board relied upon evidence of numerous sales of individual pieces of Genentech's laboratory and manufacturing equipment and expert testimony that there are more buyers for individual pieces of equipment than for entire of production or manufacturing lines. Despite the appeal board's finding, the trial court's decision repeatedly refers to the equipment in the "context of an assembly line." It should be clear that the assessments in question are to be based on the fair market value of each individual piece of equipment, not the collective value of the equipment as part of a product or manufacturing line.

*4.     Rule 6(b) Standard*

To determine the value based on the full cost of each piece of equipment, the appeals board applied the standard found in the assessors' handbook—that is, whether Genentech purchased the equipment in a finished state or whether the equipment was "self-constructed" by Genentech. The trial court rejected this standard, holding instead that an asset reaches its "finished state" when "the asset is placed in service and … becomes 'income producing.' " The proper standard is a question of law subject to our de novo review.

12

"Although assessors' handbooks are not regulations and do not possess the force of law, they serve as a primary reference and basic guide for assessors, and have been relied upon and accorded great weight in interpreting valuation questions. [Citation.] 'The interpretations and opinions of an agency administrator, while not controlling upon the courts, constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. [Citation.] "Because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise,' expressed as an interpretation (whether in a regulation or less formally . . .), that is the source of the presumptive value of the agency's views." ' " (*Sky River LLC v. County of Kern*, *supra*, 214 Cal.App.4th at pp. 735-736.) As indicated above, the assessors' handbook advises that equipment has not reached a finished state if some portion of it remains to be constructed by the purchaser. The handbook warns that "care must be taken to include only the interest attributable to the piece of equipment under construction" and provides as examples that "relocation costs are not costs contributing to the assessable value of the property" nor are costs "attributable to the holding of the property after the completion of construction." (Assessors' Handbook, at pp. 53, 57.) This standard is reasonably designed to determine the "fair market" or "full cash" value of a piece of equipment (Cal. Const., art. XIII, § l; Rev. & Tax Code, § 110, subd. (a)) and reflects an appreciation of the practical realities faced by businesses.

The trial court held, however, that equipment reaches a "finished state" when "the asset is placed in service and . . . becomes 'income producing.' " The court derived this standard from an inapposite decision of the United States Supreme Court, *Commissioner of Internal Revenue v. Idaho Power Co.* (1974) 418 U.S. 1, 13-15. In that case, the court addressed whether, for income tax purposes, "a taxpayer is entitled to a deduction from gross income … for depreciation on equipment the taxpayer owns and uses in the construction of its own capital facilities." (*Id.* at p. 3.) The court held that the taxpayer could not deduct from current gross income depreciation on such equipment, and that the depreciation is an expense that must be capitalized to the value of the asset and amortized

13

over the life of the asset.[6] This approach was not designed to determine the value or cost of the capital asset but to prevent distortion of income and ensure equal treatment of taxpayers for purposes of the federal income tax.[7] While capitalizing the costs incurred in producing an asset until the asset is put into service and becomes income producing may

---

[6] Recognizing the "necessity to treat construction-related depreciation in a manner that comports with accounting and taxation realities," the court explained, "[w]hen the asset is used to further the taxpayer's day-to-day business operations, the periods of benefit usually correlate with the production of income. Thus, to the extent that equipment is used in such operations, a current depreciation deduction is an appropriate offset to gross income currently produced. It is clear, however, that different principles are implicated when the consumption of the asset takes place in the construction of other assets that, in the future, will produce income themselves. In this latter situation, the cost represented by depreciation does not correlate with production of current income. Rather, the cost, although certainly presently incurred, is related to the future and is appropriately allocated as part of the cost of acquiring an income-producing capital asset." (*Commissioner of Internal Revenue v. Idaho Power Co., supra,* 418 U.S. at pp. 10-11.) The court reasoned that depreciation on equipment used to construct a capital asset should be treated for income tax purposes in the same manner as other costs of acquiring a capital asset, such as financing interest, tools, materials, and wages paid construction workers. (*Id*. at pp. 12-13.) The court observed, based on the facts at issue in that case, that "[t]he taxpayer's own accounting procedure reflects this treatment, for on its books the construction-related depreciation was capitalized by a credit to the equipment account and a debit to the capital facility account." (*Id*. at p. 14.)

[7] According to the court, "this capitalization prevents the distortion of income that would otherwise occur if depreciation properly allocable to asset acquisition were deducted from gross income currently realized." (*Commissioner of Internal Revenue v. Idaho Power Co., supra,* 418 U.S. at p. 14.) "It serves to prevent a taxpayer from utilizing currently a deduction properly attributable, through amortization, to later tax years when the capital asset becomes income producing." (*Id.* at p. 16.) "An additional pertinent factor is that capitalization of construction-related depreciation by the taxpayer who does its own construction work maintains tax parity with the taxpayer who has its construction work done by an independent contractor. The depreciation on the contractor's equipment incurred during the performance of the job will be an element of cost charged by the contractor for his construction services, and the entire cost, of course, must be capitalized by the taxpayer having the construction work performed. The Court of Appeals' holding would lead to disparate treatment among taxpayers because it would allow the firm with sufficient resources to construct its own facilities and to obtain a current deduction, whereas another firm without such resources would be required to capitalize its entire cost including depreciation charged to it by the contractor." (*Id*. at p. 14.)

be necessary to avoid distorting current income, the capitalization does not affect the actual cost or current value of the asset and has no relevance for purposes of a property tax. There are many reasons for which equipment may be in a "finished state" and not yet placed into service and income producing. Spare equipment may be retained to replace current aging equipment or may be stored while other construction takes place. The finished equipment is then an asset subject to taxation, but the costs associated with holding the equipment, including any interest accruing on financing, do not add to the economic value of the equipment.[8] Genentech offers the example of a tank or a freezer. When Genentech "buys a completely-manufactured piece of equipment [such as a freezer or a tank], that item is accurately described as being in its 'finished state'—even before it may be integrated into a broader system, plugged in, and switched on." Accordingly, the trial court erred in substituting its own definition of a finished product for that prescribed by the assessors' handbook and applied by the appeals board.

5.      *The relationship between FASB 34 and Rule 6*

Underlying the trial court's error is its mistaken "find[ing], as a matter of law, that the criteria for capitalization of expenses under FASB 34 and Rule 6(b) are the same." While the language in FASB 34 and Rule 6(b) is comparable, there are significant differences in the treatment of interest under the two provisions. For example, under FASB 34, capitalized interest accrues until the asset can be used, which in Genentech's case, includes through subsequent validation by the federal Food and Drug Administration. (FASB 34, p. 8, ¶¶ 17, 18.)[9] In contrast, under Rule 6(b), imputed

---

[8] Moreover, after the asset has been held for an extended period, market conditions may be such that the asset's current value bears little correspondence to its capitalized book value less depreciation.

[9] Paragraph 17 of FASB 34 reads: "The capitalization period shall begin when three conditions are present: [¶] a. Expenditures . . . for the asset have been made. [¶] b. Activities that are necessary to get the asset ready for its intended use are in progress. [¶] c. Interest cost is being incurred. [¶] Interest capitalization shall continue as long as those three conditions are present. The term activities is to be construed broadly.

interest accrues only until the equipment reaches "a finished state" or "during the construction period." (Assessors' Handbook, at pp. 57, 59.) For that reason, interest expenses prior to the commencement of manufacturing are "capitalized interest" under FASB 34 but are not included in valuation under Rule 6.

Similarly, FASB 34 considers the whole production facility for accounting purposes while Rule 6 seeks to determine the value of individual pieces of equipment. Thus, a piece of equipment may be in its "finished state" though not yet put to its "intended use" as part of an assembly line. The cost of maintaining that equipment must be considered under FASB 34 in determining the net income of the equipment's owner. The fact that actual or implied interest incurred in maintaining the idle equipment is capitalized under FASB 34 does not indicate, under Rule 6, that the interest expense

---

It encompasses more than physical construction; it includes all the steps required to prepare the asset for its intended use. For example, it includes administrative and technical activities during the preconstruction stage, such as the development of plans or the process of obtaining permits from governmental authorities; it includes activities undertaken after construction has begun in order to overcome unforeseen obstacles, such as technical problems, labor disputes, or litigation. If the enterprise suspends substantially all activities related to acquisition of the asset, interest capitalization shall cease until activities are resumed. However, brief interruptions in activities, interruptions that are externally imposed, and delays that are inherent in the asset acquisition process shall not require cessation of interest capitalization."

Paragraph 18 of FASB 34 reads: "The capitalization period shall end when the asset is substantially complete and ready for its intended use. Some assets are completed in parts, and each part is capable of being used independently while work is continuing on other parts. An example is a condominium. For such assets, interest capitalization shall stop on each part when it is substantially complete and ready for use. Some assets must be completed in their entirety before any part of the asset can be used. An example is a facility designed to manufacture products by sequential processes. For such assets, interest capitalization shall continue until the entire asset is substantially complete and ready for use. Some assets cannot be used effectively until a separate facility has been completed. Examples are the oil wells drilled in Alaska before completion of the pipeline. For such assets, interest capitalization shall continue until the separate facility is substantially complete and ready for use."

affects the value of the equipment or should be considered in determining the amount of property tax.[10]

The two rules also serve considerably different purposes. The FASB standards are used " 'for purposes of financial reporting,' " not for determining property value. (*SHC Half Moon Bay, LLC v. City of San Mateo* (2014) 226 Cal.App.4th 471, 478.) The assessors' handbook makes clear that "the accountant's concept of value . . . may or may not be the same as market value." (Assessors' Handbook, at p. 50.) "[N]ot all costs contributing to value are booked and not all costs booked contribute to value." (*Id*. at p. 53.) The purpose of FASB 34 is to accurately reflect a business's income each year, distinguishing between costs that should be charged against current income and costs that should be "capitalized" and written off against income over a longer period of time. (FASB, Statement of Financial Accounting Concepts No. 8, OB2, p. 1 <https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176157498129&acceptedDisclaimer=true > ["The objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity."].) Rule 6(b) on the other hand is designed to determine the value of property at a given point in time. As the assessors' handbook states, "The annual lien date value of personal property, which must reflect market value, is unrelated to net book value (capitalized cost less depreciation) reflected on an assessee's books. Fair market value as defined in appraisal terms and net book value as defined in accounting terms are separate concepts. Any similarity is merely coincidental. It is important to recognize the

---

[10] Genentech also notes that interest is calculated differently under the two rules. While the interest rate used under FASB 34 is "based on the rates applicable to borrowings outstanding during the period" by the company (FASB 34, ¶ 13), the interest rate used to calculate imputed interest pursuant to Rule 6(b) is based on a weighted average cost of capital for the assessee's entire industry. (See Assessors' Handbook, at p. 58 ["The rate derived should be the typical rate for the specific industry of the assessee" and "[t]he rate should be the weighted average cost of capital, taking into consideration the typical debt-equity ratio for the industry."].)

17

difference." (Assessors' Handbook, at p. 49, see also *De Luz Homes, Inc. v. County of San Diego* (1955) 45 Cal.2d 546, 567 ["The accountant deals with past historical cost to the present owner and by the process of amortization spreads the cost of property over its useful life. [Citation.] The unamortized cost reflected on the balance sheet has no relation to the 'full cash value,' i.e., the price that a willing buyer would pay a willing seller."].) In *King v. State Bd. of Equalization* (1972) 22 Cal.App.3d 1006, 1010-1011, the court explained, "Like many tax statutes, the [property] tax law employs relatively artificial, relatively self-contained, concepts. If it utilizes popular meaning or concepts from other fields of law, it does so only by force of its own objectives and definitions. . . . To pursue the will-o'-the-wisp of definitions, concepts and distinctions from other areas of law -- where they are shaped by purposes and by social and economic factors unrelated to [property] taxation -- leads to false goals. The coverage of [property] tax law is shaped by its own provisions and definitions and, where these are unclear, by applying its own perceived policies and concepts."[11]

Accordingly, the taxpayer's capitalization of interest in its accounting records is not substantial evidence that the interest should be imputed for purposes of assessing the fair market value of the equipment under Rule 6(b).

---

[11] The assessor's reliance on *Lockheed Aircraft Corp. v. County of Los Angeles* (1962) 207 Cal.App.2d 119, 129, for the proposition that "California courts have long 'recognize[d] that the assessor may properly consider book values in determining market value' " is misplaced. The court in that case acknowledged that "the object of the assessor's search is value, not cost" and that "[i]t is a truism that cost is not necessarily value." (*Id*. at p. 128.) The court held nonetheless that there was "nothing inherently improbable in the assessor's statement that he regarded the book value assigned by the manufacturer as a valid basis from which to arrive at the 'actual cash value' of these unique and unmarketable items of property." (*Id*. at p. 130.) Nothing in the record suggests that Genentech's M&E was unique and unmarketable so that there was any need to rely on book value to determine market value.

6.     *Substantial evidence supports the finding by the appeals board that the additional costs identified by the assessor should not have been included in the assessment of the equipment.*

Genentech presented substantial evidence, found credible by the appeals board, establishing that it purchases its M&E in a finished state. Genentech's Senior Vice President of Product Operations reviewed the types of devices that constitute Genentech's M&E, and testified that each of them was purchased in a finished state, not self-constructed. He testified that although Genentech would provide vendors with design specifications as to what its finished state should be, the M&E would be designed, manufactured, and installed by third parties. For example, with respect to its bioreactor tanks, he testified that Genentech "would determine the size . . . the materials . . . what kind of agitator . . . . That would all be specified. It would be sent to—normally two, three vendors for tanks. . . . They would bid, and we would select based on the best economics and the best fit for what we needed . . . .That vendor would then be responsible for the complete design. [¶] . . . [W]e didn't get involved in determining . . . what type of welds, where the welds would be, how thick the stainless steel would be, but they would do that fabrication and provide us with a finished tank." Other M&E such as chromatography columns and autoclaves "are available . . . in a variety of sizes, a variety of materials from . . . a handful of commercial vendors." Genentech's Director for the Drug Acceptance Manufacturing Group explained that Genentech contracts with an engineering firm to design the product line and it hires contractors to install the M&E in the buildings. Contrary to the assessor's argument, the fact that the equipment was constructed to Genentech's specifications does not mean that the individual pieces of equipment were not purchased in a finished state. Similarly, because each piece of equipment is subject to assessment, not the production line as a whole, the appeals board was certainly justified in determining that assembly of the custom-ordered equipment into a production line did not amount to "self-construction" under Rule 6.

Nor does Genentech's inclusion of capitalized interest, debugging costs and capitalized labor in its accounting records prove that these costs were necessary to bring

the equipment to a finished state, as the trial court found. As discussed above, Genentech's capitalization of interest under FASB 34 does not establish that the interest expense affects the value of the equipment. With respect to the remaining costs, while the board was "sympathetic to the claim that problems in determining valid costs arise because [Genetech] disavows its own general ledger entries," the appeals board concluded that based on the record before it, the general ledger entries were insufficient to satisfy the assessor's burden. The appeals board acknowledged that it had previously expressed concern "regarding taxpayers potentially exploiting deficiencies in their books and records" to avoid assessment, but the appeals board faulted the assessor in this instance for failing to conduct a proper investigation. The decision explains that the assessor's appraiser did not "investigate what any of the questionable items were and 'did not investigate these costs beyond what their description is.' [The witness] did not know, for example, whether any of the costs were incurred after the equipment was installed. He also conceded that he did not know what kind of labor was involved with any of the capitalized labor which he had included in [Genentech's] laboratory M&E cost basis."

Ultimately, the appeals board found that the amounts identified by the assessor as start-up and debugging costs in Genentech's ledger were more likely for testing those product lines as opposed to testing the individual pieces of equipment. This conclusion is supported by the testimony of the assessor's witness that Genentech's engineers told him that the start-up and debugging costs at issue were incurred to confirm that Genentech's product "doesn't have any mutations or deformities" or that Genentech's product "is exactly like it should be" and that "the expected yield is as it should be." The appeals board also found that the assessor "did not establish by a preponderance of the evidence that the capitalized labor, professional, and engineering costs at issue were incurred to bring [Genentech's] M&E to its finished state." As noted, the assessor failed to identify or investigate the labor costs and Genentech presented testimony establishing that the labor costs were incurred when Genentech made product-specific modifications to installed equipment, which resulted in product-oriented capitalized labor costs "associated with that modification and a retesting and revalidation of that equipment."

20

The assessor contends the trial court properly found that Genentech, rather than the assessor, has the burden to show that the costs booked to capitalized accounts should not be assessable. The assessor argues that the appeals board improperly required the assessor to investigate the costs reflected in Genentech's books "to determine whether they were incurred for testing of the product, or for the machinery and equipment." The assessors argument, however, ignores the distinction between the individual pieces of equipment and the production line as a whole. As noted above, substantial evidence supports the appeals board's findings that the individual pieces of equipment were purchased in a finished state and that the additional costs were incurred in connection with installation, testing and modification of the product line.

In sum, the appeals board reasonably determined on the record before it that the additional costs identified by the assessor should not have been included in the escape assessment.

7.   *Fixtures*

Before the appeals board, the parties also disputed the proper standard for valuing Genentech's laboratory and manufacturing fixtures. Ultimately, the board rejected the competing methodologies presented by both parties and concluded instead that "the proper methodology for assessing the value of Genentech's fixtures for the 2000-2005 tax years is to apply the [Board of Equalization's] 1999 Interim Guidelines." The assessor's writ petition alleges the appeals board's calculation of the cost basis for fixtures for buildings 1 and 4 failed to account for a change in ownership of the buildings in 1993. The parties disagreed as to whether the appeals board determined that the change in ownership did not affect valuation or erroneously overlooked the issue. The trial court did not address the fixtures issue in its decision and noted in response to Genentech's motion for a new trial that "those issues would be addressed by the assessment appeals board on remand in a manner consistent with this court's ruling." Although we reverse the judgment and direct the denial of relief on petitioner's first three causes of action on

remand the trial court must consider and rule on the fixtures issue set forth in the fourth cause of action.

## Disposition

The judgment is reversed and remanded for further proceedings consistent with this opinion. The trial court shall enter an order denying relief on the first three causes of action in the petition and shall consider and rule upon the claim in the fourth cause of action.

POLLAK, P. J.

WE CONCUR:

STREETER, J.
BROWN, J.

Filed 7/16/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MARK CHURCH, as County Assessor, etc., <br><br> Plaintiff and Respondent, <br> v. <br><br> SAN MATEO COUNTY ASSESSMENT APPEALS BOARD, <br><br> Defendant and Respondent; <br> GENENTECH, INC., <br><br> Real Party in Interest and Appellant. | A155034 <br><br> (San Mateo County <br> Super. Ct. No. 16-CIV-01058) <br><br> ORDER CERTIFYING OPINION <br> FOR PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed on June 26, 2020, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

Date: POLLAK, P.J.

1

| | |
|---|---|
| Trial court: | San Mateo County Superior Court |
| Trial judge: | Honorable George A. Miram |
| Counsel for real party in interest and Appellant: | Mcdermott Will & Emery LLP<br>Charles J. Moll III<br>Troy M. Van Dongen |
| Counsel for plaintiff and respondent: | John C. Beiers, County Counsel<br>Rebecca M. Archer, Lead Deputy<br>Brian E. Kulich, Deputy |
| Counsel for defendant and respondent: | No appearance. |

A155034