Filed 12/31/20

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TIM PHILLIS et al., <br><br>     Plaintiffs and Appellants, <br> v. <br> COUNTY OF HUMBOLDT, <br><br>     Defendant and Respondent. | A158725 <br><br> (Humboldt County <br> Super. Ct. No. DR170699) |

    Appellants Tim and Kathy Phillips sought a reduction in the value at which property they purchased at a trustee's sale was assessed, then challenged the value determined by the Assessment Appeals Board (Board) in superior court. They appeal from the judgment against them, arguing the Board improperly failed to apply the statutory presumption that the purchase price established the property's value, conducted a flawed comparable sales analysis, and made various other errors. We affirm.

---

    \* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II. and III.

1

# BACKGROUND

On June 26, 2013, appellants purchased real property in Humboldt County at a public trustee sale for $153.806.41. The trustee's deed, was recorded on July 12, 2013.[1]

The property consists of two 80-acre parcels (parcel 101-122-006 & 101-131-001), which appellant[2] testified had been merged in May 2000, and which were treated as one appraisal unit by the Humboldt County Assessor (Assessor). The terrain is mostly steep and wooded.

As described by the appraiser, there is a 1,508 square foot, three-bedroom, two-bathroom, manufactured home on a permanent foundation on parcel 101-131-001, which uses a solar generator system for power, a spring-fed water system, and septic system. There are also several outbuildings and sheds that are in poor condition and do not add to the overall value of the property.

According to appellant's testimony, the property had been purchased in May 2000 for $125,000, and the owner added the modular home in 2001 at a cost of $85,000. The prior owners tried without success to sell all or a portion of the property in 2005, 2006, and 2009, and the mortgage holder foreclosed in 2012. The property is approximately two miles from a public road. When the prior owners left the property, they took the gas-powered generator, which was the only source of power; PG&E is two miles away. The prior owners had drilled two wells that failed to produce water and "had been hauling domestic water for years." Mice had ruined the central heat ducting under the house and the private road had been neglected for years. As

---

[1] The trustee's deed shows the unpaid debt, together with costs, was $245,179.10.

[2] References to appellant in the singular are to Tim Phillis.

2

appellant noted, the appraiser stated the property was in "poor" condition. After purchasing the property, appellant found a water source and installed a solar pump to pump water for the house, as well as an operating solar system.

On November 26, 2013, appellants submitted an application for changed assessment (application No. 13-26); they filed an additional application (application No. 14-68) on November 10, 2014, and two more (application Nos. 14-72 & 14-73) on November 12, 2014.[3] The enrolled property value challenged in application Nos. 13-26, 14-72, and 14-73 was $469,976, which was the prior owner's assessment.[4] In November 2014, the Assessor reappraised the property at $415,000, using a comparable sales analysis, and this was the value challenged in application No. 14-68. The Assessor explained that this appraisal was the result of a "2013 Prop 8" conducted as an "interim" measure because appellants had purchased the

_____

[3] Application Nos. 13-26, 14-72, and 14-73 erroneously list the enrolled property value as $476,697 (application Nos. 13-26 and 14-72) and $472,140 (application No. 14-73). As shown on the property tax bills, the $476,697 figure omits the $7,000 homeowner exemption that resulted in the $469,976 enrolled value. The figures on application No. 14-73 appear to result from mathematical and/or clerical errors: This application erroneously lists $372,494 as the land value rather than $370,811 (as shown on the property tax bills and application Nos. 13-26 and 14-72), lists $106,464 as the value of the improvements rather than the correct $106,165, and shows a total value of $472,140 while the correct total of the figures listed would be $479,140 (372,494 plus 106,646 equals 479,140).

[4] A note in the "Transaction Record" for the property states, "Valued both properties at $415,000, due to disagreement in value and app for appeal, revalued for 2013 and 2014 Prop B. 2013 value set at $415,000, and 2014 value remains at $415,000.00. To place on 2013 Prop 8, value for land had to be adjusted. The preceding note, dated July 21, 2014, stated, "Spoke w/owner, property purchased in auction. Property was in poor condition. Owner will appeal anything over purchase price. Sold w/#101-131-001."

property and were responsible for the outstanding taxes but "could not appeal the base year for 2013," and a value had not yet been set for the date of acquisition. . . .

Appellants' applications were initially heard by the Board on March 12, 2015. Relying upon the presumption stated in Revenue and Taxation Code[5] section 110, subdivision (b), that the purchase price of real property is rebuttably presumed to be its "full cash value" or "fair market value" "if the terms of the transaction were negotiated at arms length between a knowledgeable transferor and transferee neither of which could take advantage of the exigencies of the other," appellant argued at the hearing that the price he paid for the property had to be treated as its taxable value unless respondent County of Humboldt could prove the foreclosure sale at which it was purchased was not an open market, arms length transaction.[6]

The Assessor took the position that a foreclosure sale is not an open market transaction. The appraiser testified that although the trustee's sale is public, potential purchasers at a public trustee sale in the county are limited by the requirements that a deposit of $2,500 be submitted prior to the auction and a winning bid must be paid within three days after the auction, so "traditional financing" is not available. The Assessor's office pointed to an annotation from the California State Board of Equalization (SBE) stating that "[t]he presumptions of full cash value under Revenue and Taxation Code section 110 do not apply to execution and/or foreclosure sales, since these are

---

[5] Further statutory references will be to the Revenue and Taxation Code unless otherwise specified.

[6] Appellant testified that no other bids were made at the auction.

4

forced sales and thus considered non-market transactions."[7] (Board of Equalization, Property Taxes Law Guide (Revision 2017), Annotation No. 460.0031 (Mar. 26, 1999) <https://www.boe.ca.gov/lawguides/property/current/ptlg/annt/460-0031.html> [as of Dec. 31, 2020].)

Appellant also challenged the Assessor's comparable sales analysis, which was summarized on a spreadsheet comparing various aspects of appellants' property with seven others, referred to as "Comp 1" through "Comp 5," "711 Sawdust trail," and "Off Centerville Rd." Appellant argued the properties used as comparisons were "vastly different in size" and a "considerable distance" from the subject property; unlike his property, all but one of the comparison properties had PG&E service and all had water; the climate differed between the properties; and the subject property was in "substantially worse condition" than the others. In addition, appellant stated the Assessor's office had "no calculations to arrive at the lot size value adjustment."[8]

---

[7] The Board of Equalization annotations are published summaries prompted by requests for legal opinions, "brief statements—often only a sentence or two—purporting to state definitively the tax consequences of specific hypothetical business transactions. More extensive analyses, called 'back-ups,' are available to those who request them." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 4–5 (*Yamaha*).)

[8] Appellant asserted that one property on a July 2014 list was comparable to his, a 152-acre lot that sold for $130,000 in July 2013, and that this and a second property on the same list, a 160-acre lot that sold for $250,000 in October 2012, were "closest in size and location and amenities" to his property. This was not the list of comparable properties in fact used to establish the value of appellants' property. The appraiser testified that the spreadsheet appellant was referring to was "the first attempt at finding comparables which was a failed attempt." After further research, and after giving the list to appellant as part of an "open dialog" regarding the

5

In response to questions from the Board, appellant testified that his property was about two miles off a public road; the appraiser testified that while some of the comparable properties were closer to public roads, he did not feel this required adjustment because the properties were "drastically further" from cities and towns than the distance from appellants' property to Ferndale. Asked about adjustments for the absence of public utilities on the property, the appraiser testified that he was not aware there was a problem with water or power and had been told "it was on solar" and had well water. He testified that if he had known, "I don't know that it would make that big of a difference. A lot of these rural properties have issues with power and water." Acknowledging appellant's statement that the comparables did not have a problem with power, the appraiser said the information he had did not indicate one way or the other.

After Board members expressed agreement with the Assessor's view that a foreclosure sale is not an open market transaction, the matter was continued to allow the parties to attempt to reach a mutually acceptable determination of value in light of this view, and for the appraiser to address issues of concern to the Board regarding the comparables, including the properties' access to utilities and distance from a public road.

At the continued hearing in July 2015, appellant continued to rely upon the purchase price presumption as the measure of value, and argued the SBE annotation addressed tax sales rather than foreclosure sales. The appraiser

---

Assessor's process, the appraiser found the properties on this sheet were not comparable sales because each was "a direct from seller" sale that did not meet market standards or a gift, and one had different zoning ("TMZ" or Timberland Production Zone) than appellant's property. None of the four properties on this list were among the comparables used by the Assessor to arrive at the $415,000 valuation.

provided information on whether each of the comparables had utility services and the distance of each from a public road. Appellant again argued the properties were not sufficiently similar to comply with the governing rules, while the appraiser explained that it was difficult to find comparable properties because the subject property is "unique" and these were "the best comps we could find," "rural properties with a manufactured home on it."

The Board concluded that a foreclosure sale is not a fair market value sale and determined the value of the property to be $250,000, finding the comparable sales provided by the Assessor's office "of marginal help due to condition, location, topography and parcel size."

Appellants filed a tax refund action in superior court in November 2015, which was resolved by a stipulation for remand to the Board for determination of the value of the property based on evidence in the administrative record of the March 12 and July 20, 2015 proceedings. The stipulation and order vacating the Board's 2015 decision, remanding the matter for a new hearing, decision and findings of fact, and dismissing the superior court action, was filed on March 8, 2017. Prior to the hearing on remand, appellants objected to the participation of one member of the Board. After a hearing, the request for disqualification was denied.

At the June 8, 2017 hearing on remand, appellant again maintained the purchase price was the proper measure of value of the property, argued the comparative sales analysis could not be utilized unless the Assessor proved the foreclosure sale was not an open market transaction, and argued the properties the Assessor used as comparables were too dissimilar for this purpose. The Assessor reiterated the position that the foreclosure sale was not a market transaction, again pointing to Annotation No. 460.0031. The Assessor also noted the discussion of open market transactions in the

7

Assessment Appeals Manual, which states that that " '[o]pen market conditions which tend to produce a 'full cash value' or 'fair market value' as defined in section 110 include:  [¶] Exposure on the open market for a sufficient amount of time [¶] Neither the buyer nor the seller is able to take advantage of the exigencies of the other [¶] Both parties are seeking to maximize their gains [¶] Both buyer and seller have full knowledge of the property and are acting prudently."  (SBE, Assessment Appeals Manual (May 2003) pp. 88–89.)  Appellant asked the Board to remove the annotation from the record, arguing the Assessor violated statutory exchange of information rules by failing to provide it in response to appellants' request for evidence that the foreclosure sale was not an open market transaction.

The Board issued its ruling on August 3, 2017, finding the fair market value of the property on July 12, 2013, was $335,000.  The Board disagreed with both the Assessor's determination of $415,000 as the fair market value of the property and appellant's position that the fair market value was $153,806.41.  Its written findings state that a foreclosure sale "is generally not considered an open market transaction for purposes of determining fair market value," citing the SBE letter underlying Annotation No. 460.0031, and, with respect to appellant's objection, stating the document was considered as legal authority offered by the Assessor rather than as factual evidence.  The Board also found that even if foreclosure sales could be considered open market in some circumstances, the sale in this case did not meet the required parameters in that it required potential bidders to pay a cash deposit and pay the total amount in cash within three days, thus excluding purchasers using traditional financing; the seller was forced to sell and not necessarily a " 'willing' seller at the auction price"; the sale lacked "the exposure typical to real estate marketing"; and the buyer was in "at least

8

the potential position" of being able to take advantage of the owner's necessity to sell. The Board found the comparable sales evidence was "of sufficient weight to establish that the $153,806.41 paid by the Applicant was below the fair market value of the Subject Property on the date of transfer." Noting that appellant claimed the property was not habitable due to lack of power and water, that the comparables were habitable properties and that appellant had restored water to the property at a cost of about $7,000, the Board found the condition of appellants' property was "generally of lower quality" than the comparables and assigned $15,000 to $20,000 as a "reasonable range of value for that difference in condition." Disagreeing with the Assessor's value and adjustments for the difference in size between appellants' parcel and the comparison properties, the Board found "an amount of approximately $500 per acre to be a more reasonable value" for purposes of adjustment for size.[9] The Board applied its adjustments, excluding the "high value and low value of comparable properties 1-5 plus Sawdust Trail," resulting in an "approximate average" of $336,200 for the comparable properties, and concluded "a reasonable fair market value" for appellants' property on the date of transfer was $335,000.

On November 17, 2017, appellants filed a second lawsuit, alleging causes of action for property tax refund, federal and state due process violations, violations of title 42, United States Code section 1983, and declaratory relief. The trial court granted respondent's motion for summary adjudication of the second through fifth causes of action, which were based on

_____

[9] The amount of the appraiser's lot size adjustment for each comparison property, divided by the number of acres by which that property differed from appellants' property, would result in per-acre values of $980, $1,282, $1,017 and $1,007 for the four properties considered by the Board.

9

the same factual allegations as the first cause of action, leaving only the tax refund claim for trial.

After a bench trial, the court ruled in favor of respondent, finding the property was not obtained in an open market transaction, there was substantial evidence to support the Board's conclusion as to the assessed value of the property, and appellants' due process rights were not violated by the procedural issues appellants raised. Judgment was filed on August 26, 2019.

## DISCUSSION

"The proper scope of review of assessment decisions is well established. (*Bret Harte Inn, Inc. v. City and County of San Francisco* (1976) 16 Cal.3d 14, 21–23.) 'When the assessor utilizes an approved valuation method, his factual findings and determinations of value based upon the appropriate assessment method are presumed to be correct and will be sustained if supported by substantial evidence.' (*Service America Corp. v. County of San Diego* (1993) 15 Cal.App.4th 1232, 1235 (*Service America Corp.*).) However, where the taxpayer attacks the validity of the valuation method itself, the issue becomes a question of law subject to de novo review. (*Ibid.*; see *GTE Sprint* [*Communications Corp. v. County of Alameda* (1994)] 26 Cal.App.4th [992,] 1001.)" (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 606.) Here, appellants' argument that the Board was required to accept their purchase price as the taxable value of the property unless respondent proved by a preponderance of the evidence the property was not purchased in an open market, arms length transaction is a challenge to the methodology of valuation, presenting a question of law. The same is true to the extent appellants argue the properties used in the Assessor's comparative sales analysis were not sufficiently similar to the

10

subject property to be used for that purpose.  To the extent appellants challenge the application of the comparable sales analysis—the findings of fact and determinations of value resulting from the analysis—we review for substantial evidence.

## I.

"California Constitution, article XIII, section 1, provides that all property 'is taxable and shall be assessed at the same percentage of fair market value,' with certain exceptions not relevant here.  California Constitution, article XIII A, section 1, places certain restrictions on the assessment of taxes on real property and does so by reference to the 'full cash value' of the property.  Section 2, subdivision (a) of article XIII A defines "full cash value' for properties purchased after 1975 as 'the appraised value' of the property at the time of purchase.  Where the full cash value is established upon purchase and sale of the property, the term 'full cash value' has the same meaning as fair market value measured at the date of such purchase. (*Blackwell Homes v. County of Santa Clara* (1991) 226 Cal.App.3d 1009, 1013.)"  (*Maples v. Kern County Assessment Appeals Bd.* (2002) 103 Cal.App.4th 172, 179–180 (*Maples*).)

Section 110, subdivision (a) provides that " 'full cash value' or 'fair market value' means the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used, and of the enforceable restrictions upon those uses and purposes."

The tax rules promulgated by the SBE further provide:  "In addition to the meaning ascribed to them in the Revenue and Taxation Code, the words

11

'full value', 'full cash value', 'cash value', 'actual value', and 'fair market value' mean the price at which a property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would transfer for cash or its equivalent under prevailing market conditions between parties who have knowledge of the uses to which the property may be put, both seeking to maximize their gains and neither being in a position to take advantage of the exigencies of the other. [¶] When applied to real property, the words 'full value', 'full cash value', 'cash value', 'actual value' and 'fair market value' mean the price at which the unencumbered or unrestricted fee simple interest in the real property (subject to any legally enforceable governmental restrictions) would transfer for cash or its equivalent under the conditions set forth in the preceding sentence." (Cal. Code Regs., tit. 18, § 2, subd. (a).)

The presumption appellants rely upon in this case is established in subdivision (b) of section 110: "For purposes of determining the 'full cash value' or 'fair market value' of real property, other than possessory interests, being appraised upon a purchase, 'full cash value' or 'fair market value' is the purchase price paid in the transaction unless it is established by a preponderance of the evidence that the real property would not have transferred for that purchase price in an open market transaction. The purchase price shall, however, be rebuttably presumed to be the 'full cash value' or 'fair market value' if the terms of the transaction were negotiated at arms length between a knowledgeable transferor and transferee neither of which could take advantage of the exigencies of the other. 'Purchase price,' as used in this section, means the total consideration provided by the purchaser or on the purchaser's behalf, valued in money, whether paid in money or otherwise. . . ."

12

The tax rules elaborate that in valuing real property as a result of a change in ownership, "it shall be rebuttably presumed that the consideration valued in money, whether paid in money or otherwise, is the full cash value of the property. The presumption shall shift the burden of proving value by a preponderance of the evidence to the party seeking to overcome the presumption. The presumption may be rebutted by evidence that the full cash value of the property is significantly more or less than the total cash equivalent of the consideration paid for the property. A significant deviation means a deviation of more than 5% of the total consideration." (Cal. Code Regs., tit. 18, § 2, subd. (b).)

Appellants argue that under the above provisions, the Assessor had the burden of proving the foreclosure sale in which they purchased the property was not an open market transaction and establishing by a preponderance of the evidence that the price would have been different if the sale had taken place under open market conditions. Appellants complain that, despite the Assessor's failure to produce evidence the transaction was not an open market sale, the Board improperly rejected the purchase price presumption by relying upon the Board chairman's personal opinion that a public trustee auction is never an open market sale and Annotation No. 460.0013, expressing the same view. Reliance upon the Board chairman's opinion, appellants' urge, violates regulations requiring the Board to render its decision "on the basis of proper evidence at the hearing." (Cal. Code Regs., tit. 18, § 302) As to the annotation, appellants emphasize that SBE annotations, as staff interpretations of statutory law, are not binding authority. (*Helene Curtis, Inc. v. Assessment Appeals Bd.* (1999) 76 Cal.App.4th 124, 132; *Yamaha, supra,* 19 Cal.4th at p. 7.)

Appellants' position assumes the rebuttable purchase price presumption applies in every case, and controls absent evidence the particular purchase in question was not an arms length, open market transaction. The Board (and superior court) found the presumption does not apply to purchases at foreclosure sales because such sales, by their nature, are not open market transactions and, therefore, the precondition to application of the presumption is not met.[10] The SBE has expressed this view not only in Annotation No. 460.0031 (https://www.boe.ca.gov/lawguides/property/current/ptlg/annt/460-0000-all.html> [as of Dec. 31, 2020]), but also Annotation No. 848.0003 (<https://www.boe.ca.gov/lawguides/property/current/ptlg/annt/848-0000-all.html> [as of Dec. 31, 2020]).[11] We agree.

" '[I]t is common knowledge that at forced sales such as a trustee's sale the full potential value of the property being sold is rarely realized.' (*Strutt v. Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 876; see also *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1236 [property's price at trustee's sale 'is not deemed the equivalent of the property's fair market value'].)" (*Melendrez v. D & I Investment, Inc.* (2005) 127 Cal.App.4th 1238, 1254.) *Alliance Mortgage Co.,* at pages 1236–1237 (*Alliance Mortgage*),

---

[10] Of course, as recognized by the rebuttable nature of the presumption, "even an arm's length, open market transaction may involve factors that skew the purchase price and make it an unreliable indicator of the fair market value." (*Dennis v. County of Santa Clara* (1989) 215 Cal.App.3d 1019, 1028.)

[11] Annotation No. 848.0003 (2016) states: "Purchases at foreclosure auctions are not considered open-market transactions because they are, by definition, 'forced sales' characterized by nonmarket conditions. Thus, the purchase price presumption does not apply to properties that are purchased at auction because they are not 'open-market' transactions as contemplated by Revenue and Taxation Code section 110(b)."

explained why "[t]he price at a foreclosure sale is not deemed the equivalent of the property's fair market value" with a quotation from *BFP v. Resolution Trust Corp.* (1994) 511 U.S. 531 (*BFP*), " 'An appraiser's reconstruction of "fair market value" could show what similar property would be worth if it did not have to be sold within the time and manner strictures of state-prescribed foreclosure.  But property that *must* be sold within those strictures is simply *worth less.*  No one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques.' " (*Alliance Mortgage*, at p. 1237.)

*BFP* further explained:  "[M]arket value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very *antithesis* of forced-sale value.  'The market value of . . . a piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular . . . piece of property.'  Black's Law Dictionary 971 (6th ed. 1990).  In short, 'fair market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale."  (*BFP, supra,* 511 U.S. at pp. 537–538.)

Appellants argue that the sale in the present case was not "forced" because the trustee "was a willing party" and, according to appellant's testimony, the public auction was noticed for seven months before it actually took place and there was " 'no time limit or a minimum price paid by law, nor were there any additional liens by a public entity' to be paid."  Appellants also state that their purchase met a minimum acceptable value that was

15

established prior to the trustee's sale,[12] and emphasize that the property failed to sell when it was listed on the open market in 2005, 2006, and 2009. These factors, they maintain, distinguish the particular trustee's sale in the present case from the "reasoning" of *Alliance Mortgage*.

The argument is not persuasive. All foreclosure sales must be conducted in accordance with statutory requirements regarding notice, timing, bids, and other particulars. The trustee is not attempting to maximize gain, as would be expected of a seller in an open market transaction; he or she is attempting to recoup the amount of a defaulted loan, regardless of the actual value of the security property, and the lender does not keep any surplus over the amount of the secured obligation and costs of foreclosure. (Civ. Code, § 2924k; *Zieve, Brodnax & Steele, LLP v. Dhindsa* (2020) 49 Cal.App.5th 27, 30–31.) " '[N]either appraisal nor judicial determination of fair value is required' " (*Alliance Mortgage, supra,* 10 Cal.4th at p. 1236, quoting Sheneman, Cal. Foreclosure: Law and Practice (1994) § 6.01, p. 6–3), and a foreclosure sale is valid even if there is "great disparity between the foreclosure price and the value of the property." (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 94.)

In the present case, as the Board indicated in its findings, the trustee's sale required bidders to pay a cash deposit in order to participate and to pay the total purchase price within three days, thus excluding potential purchasers relying upon traditional financing; the seller was forced to sell in order to recover anything on the defaulted loan; and the sale lacked typical real estate marketing. The Board's statement that the "seller was not

---

[12] Appellant supports this assertion with citation to the public auction notice and trustee's deed in the administrative record. As far as we can tell, these documents do not provide the stated information.

16

necessarily a 'willing' seller at the auction price" is certainly justified by the fact that the price appellants paid—153,153,806.41—was considerably less than the $228,460.69 outstanding debt secured by the property. As for the fact that the property did not sell in 2005, 2006, and 2009, appellants offer no information about the market conditions or other circumstances of those attempted sales and how they compare to the situation at the time of the sale in 2013.[13]

In short, whatever distinctions there might be between the specific foreclosure sale here and another held more quickly, or on an obligation subject to additional liens, a foreclosure sale is by nature not an open market transaction supporting application of the section 110 purchase price presumption.[14]

---

[13] According to the appraiser, the property was listed for sale in 2009 at around $500,000, and the owners were attempting to sell it as two separate parcels despite the two having been merged.

It is also worth noting that appellant's testimony that the property sold for $125,000 in 2000 (without the home, which was subsequently added at a cost of about $85,000) is of little relevance to the property's value 13 years later.

[14] Appellants' attempt to liken the foreclosure sale here to the sale in *Maples* is not convincing. *Maples* involved sale of a petroleum reserve by the federal Department of Energy in a sealed bid auction, with the minimum acceptable bid set after appraisal by independent appraisers. (*Maples, supra,* 103 Cal.App.4th at pp. 176–177.) The solicitation for bids encouraged offerors to " 'submit offers at prices and on terms which maximize the value to the Government' " because "some offerors may be eliminated from further consideration before discussions are held," and the court observed that the Department of Energy "adopted a tough negotiating position." (*Maples,* at p. 185.) This situation is a far cry from a foreclosure sale at which the property must be sold to the highest bidder on the day of the auction. (Civ. Code, § 2924g, subd. (a).)

Appellants' argument that the Board improperly relied upon the chairman's opinion that foreclosure sales are not open market transactions necessarily depends on the faulty premise that this point must be proven by the evidence in any given case. Despite being framed as an "opinion" in the chairman's remarks during the hearing (and those of other members), the Board's conclusion that a foreclosure sale is not considered an open market transaction for purposes of determining fair market value was an interpretation of law, not a factual conclusion required to be drawn from evidence in the case regarding this particular transaction.

Nor did the Board act improperly in considering the SBE annotation. While not dispositive, such agency interpretations are "entitled to consideration and respect by the courts" (*Yamaha, supra,* 19 Cal.4th at p. 7) and, no less so, by the Board. Here, as discussed, the annotation expressed a view entirely consistent with legal authority.

**II.**

Even where the purchase price presumption applies, it may be rebutted by evidence "that the fair market value of the property is otherwise." (*Dennis v. County of Santa Clara, supra,* 215 Cal.App.3d at p. 1028.) Here, the Board found the comparable sales analysis established the purchase price was below the fair market value of the property. Appellants maintain the comparative sales analysis was flawed.

Section 402.5 provides, "When valuing property by comparison with sales of other properties, in order to be considered comparable, the sales shall be sufficiently near in time to the valuation date, and the properties sold shall be located sufficiently near the property being valued, and shall be sufficiently alike in respect to character, size, situation, usability, zoning, or other legal restriction as to use unless rebutted pursuant to Section 402.1, to

18

make it clear that the properties sold and the properties being valued are comparable in value and that the cash equivalent price realized for the properties sold may fairly be considered as shedding light on the value of the property being valued. 'Near in time to the valuation date' does not include any sale more than 90 days after the valuation date." Section 402.1 establishes a presumption that restrictions on a property will continue and will affect its value, and describes circumstances in which the presumption may be rebutted.[15]

Tax rule 4 provides that "[w]hen reliable market data are available with respect to a given real property, the preferred method of valuation is by reference to sales prices," and sets forth requirements to be met in using this method. (Cal. Code Regs., tit. 18, § 4.) These include a requirement that the assessor "[m]ake such allowances as he [or she] deems appropriate for differences between a comparable property at the time of sale and the subject property on the valuation date, in physical attributes of the properties, location of the properties, legally enforceable restrictions on the properties' use, and the income and amenities which the properties are expected to produce." (Cal. Code Regs., tit. 18, § 4, subd. (d).)

---

[15] Section 402.1, subdivision (b), provides, "There is a rebuttable presumption that restrictions will not be removed or substantially modified in the predictable future and that they will substantially equate the value of the land to the value attributable to the legally permissible use or uses." "Grounds for rebutting the presumption may include, but are not necessarily limited to, the past history of like use restrictions in the jurisdiction in question and the similarity of sales prices for restricted and unrestricted land." (§ 402.1, subd. (c).) "In assessing land with respect to which the presumption is unrebutted, the assessor shall not consider sales of otherwise comparable land not similarly restricted as to use as indicative of value of land under restriction, unless the restrictions have a demonstrably minimal effect upon value." (§ 402.1, subd. (d).)

Appellants argue that in order to comply with tax rule 4, assessors may not provide the Board with "raw data within a range of values" (*Main & Von Karman Associates v. County of Orange* (1994) 23 Cal.App.4th 337, 343 [disapproving assessor "giving the [Board] the raw data and stating that the assessor's opinion was within the 'range of values' shown by the data"]) and must give each adjustment " 'separate and serious consideration' " (*Midstate Theatres, Inc. v. County of Stanislaus* (1976) 55 Cal.App.3d 864, 881 (*Midstate Theatres*)). *Midstate Theatres* found that rule 4 was not complied with where an assessor made an "overall adjustment" without specific adjustments for the factors enumerated in rule 4. (*Midstate Theatres,* at pp. 880–881.) In *Main & Von Karman Associates*, the assessor erroneously believed the requirements of tax rule 4 were "guidelines" and did not make adjustments to the raw data provided to the Board. (*Main & Von Karman Associates,* at p. 343.) The problems addressed in these cases do not appear in the present one. The comparables spread sheet shows specific adjustments for quality of the properties, square footage of the homes, number of bedrooms, condition, lot size, an attached garage on one comparable, and living space. The appraiser noted that appellants' property was slightly further from the public road than the comparables, but testified he did not feel an adjustment was needed because the property was closer to services. He testified that all but one of the comparison properties had PG&E hook-ups but "[t]he market wasn't showing any need" for an adjustment on this basis. It is apparent the Assessor considered the specific attributes of and differences between the properties and made adjustments as deemed appropriate.

Appellants argue that one of the properties used as a comparable, "Comp 2," was not appropriate for this purpose because it was zoned half

20

"TPZ" (timberland preserve zone) and half agricultural, while appellants' property is zoned "unclassified." Zoning is one of the restrictions on use of land an assessor is required to consider with respect to the valuation of property. (§ 402.1, subd. (a)(1).)

Appellants point to the statement in *Jones v. County of Los Angeles* (1981) 114 Cal.App.3d 999, 1006, that "[t]he purported use of the 'comparable sales' method based on sales of property which are not subject to the same limitation on use as the property in question is not a valid method of valuing the property." The property in *Jones* was designated on the county's general plan as "open space" and subject to an injunction prohibiting the county from issuing building or grading permits, approving subdivision maps, conditional or special use permits or variances, or adopting zoning ordinances regarding the property. The court held that properties not subject to these restrictions could not be used as comparables: "It seems evident that when property is the subject of a specific injunction limiting its use, there can be no comparison of value drawn from sales of property which are unfettered by such injunction." (*Id.* at p. 1007.) Similarly, *Meyers v. County of Alameda* (1977) 70 Cal.App.3d 799, 807–808, held that property zoned agricultural could not be valued by comparison with sales of properties not similarly restricted absent evidence that the agricultural restriction had " 'a demonstrably minimal effect upon value.' "

Here, the appraiser described the "unclassified" zoning applicable to appellant's property as "the least stringent zoning that there is for this type of property." Appellants' situation is the opposite of that in the cases they rely upon, as use of a *more* restrictively zoned property would not artificially inflate the value of appellants' property. (See § 402.1, subd. (d) [precluding assessment of land under restriction by comparison to land not similarly

21

restricted unless restrictions have demonstrably minimal effect on value].) If anything, the more restrictive zoning of Comp 2 would have worked to appellants' advantage by reducing the value of the comparison property.[16] As the court explained in *Dressler v. County of Alpine,* (1976) 64 Cal.App.3d 557, 569–570, section 402.5 "demands only 'sufficient [similarity] to make it clear' that the property sold may 'fairly be considered' as bearing upon the assessment appraisal." Given the difficulty of finding precisely comparable properties in the circumstances of this case, consideration of Comp 2 was not impermissible.

Appellants also challenge as arbitrary the $500 per acre figure the Board found to be "more acceptable" than the appraiser's higher amount for adjusting the differences in lot size between the comparables and the subject property. Appellants argue that when they requested the Assessor's calculations for the comparable properties, they were not provided any calculations pertaining to the adjustment for disparities in acreage,[17] and

---

[16] Appellant argued at the July 2015 hearing that Comp 2 could not be used because "by the appraiser's own admission [the zoning] doesn't allow it to be used as a comparable." The "admission" was the appraiser's testimony that a property initially considered in a prior set of comparisons could not be used because it was zoned TPZ. The appraiser explained that he had first looked at properties "more specific to [appellants'] area" and "[t]he problem we were running into is these large parcels were all TPZ and they were all vacant land. . . . They weren't comparable properties and so we weren't using those. And I did say we didn't use those TPZ lands for that specific instance." Comp 2 was only one of the properties ultimately used in the comparative sales analysis.

[17] The Assessor's letter responding to appellant's request stated, "This document has been provided to you on November 13, 2014, copy attached." The documents following this letter in the administrative record include a spreadsheet showing the comparable properties and adjustment amounts for lot size and several other variables (quality, square feet, bedrooms, condition,

that appellant's own calculations—derived by dividing the land value stated on the property tax bill for each property by its number of acres—indicate per acre values for the comparables ranging from $9,132 per acre (Comp 3) to $28,701 per acre (Comp 1). Indeed, appellant refers to his calculations as the "undisputed value per acre of the comparable properties" and "the only lot size value evidence with comparable properties in the administrative record." Obviously, accepting these calculated per acre values would not serve appellants' interests, as they would significantly increase the value of the comparables and, therefore, appellants' property. Moreover, appellant's calculations assume a uniform per acre value regardless of lot size. The Board chairman explained that "division of a small acreage parcel and the per acre value is not relevant to a large parcel. Each . . . additional acre is worth less than the last one . . . . A hundred acre parcel is not worth twice a 50 acre parcel . . . ."

One of appellants' arguments indicates a fundamental misunderstanding of the Board's use of the $500 per acre figure. The SBE Assessors' Handbook, in a section on the comparative sales approach to valuation of manufactured homes, states that when a manufactured home and the site it occupies are sold as a unit, "[w]hen an accurate estimate of land value is possible, the residual offers a good indicator of the home's value." (SBE, Assessors' Handbook, Assessment of Manufactured Homes & Parks (Nov. 2001) § 511, p. 33 <https://www.boe.ca.gov/proptaxes/pdf/ah511final.pdf> [as of Dec. 31,

_____

attached garage, detached garage), but no calculations explaining the adjustment amounts.

23

2020].)[18]  Inverting this reasoning, appellant calculates that the Board's $500 per acre value would give his 160 acres a value of $80,000, which, subtracted from the Board's total valuation of $335,000, would result in a value of $255,000 for the manufactured home, while the highest value the Assessor assigned to the home was $106,165.[19]  Appellants' reasoning appears to be that this calculation shows the $500 per acre value must be inaccurate.  But

_____

[18] " '[A]ssessors' handbooks are not regulations and do not possess the force of law . . . ,' but 'they serve as a primary reference and basic guide for assessors, and have been relied upon and accorded great weight in interpreting valuation questions.  [Citation.]'  (*Sky River* [*LLC v. County of Kern* (2013)] 214 Cal.App.4th [720,] 735; see *Watson Cogeneration Co. v. County of Los Angeles* (2002) 98 Cal.App.4th 1066, 1070, fn. 2.)"  (*SHC Half Moon Bay, LLC v. County of San Mateo* (2014) 226 Cal.App.4th 471, 485.)

Appellants ask us to take judicial notice of several sections of the SBE Assessors' Handbook; respondent objects, primarily because no such request was made in the trial court.  We grant the request.  A reviewing court may take judicial notice of matters not before the trial court even though it need not do so.  (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325; *Doers v. Golden Gate Bridge, etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1.)  "It is well established that assessor's handbooks are subject to judicial notice by the courts."  (*Hunt-Wesson Foods, Inc. v. County of Alameda* (1974) 41 Cal.App.3d 163, 180.)  They are routinely discussed in cases reviewing issues such as involved in the present case.  (E.g., *Elk Hills Power, LLC v. Board of Equalization, supra,* 57 Cal.4th at p. 616; *SHC Half Moon Bay, LLC v. County of San Mateo, supra,* 226 Cal.App.4th at p. 485; *Sky River LLC v. County of Kern, supra,* 214 Cal.App.4th at p. 727.)  The portions appellants ask us to judicially notice add to material already in the record and are directly relevant to legal issues before us.

[19] Appellants express confusion over the Assessor's enrolled value for the improvements on their property.  They refer to a 2019 letter in which the Assessor stated that the $335,000 base year value was allocated $111,000 for the land in parcel 101-222-006, $174,000 for the land in parcel 101-131-001, and $50,000 to improvement value.  We decline appellants' request to take judicial notice of the Assessor's letter, which was written and received long after the proceedings before us on this appeal.

24

the Board did not find appellants' land had a value of $500 per acre; it found $500 per acre to be the appropriate amount to use in adjusting the value of comparison properties with considerably less acreage than appellants' property, and reduced the value of the comparables accordingly.

Appellant is correct that the record does not explain how the Board reached the specific amount it found reasonable for the adjustment of lot size differences. But this is not necessarily fatal to the Board's ultimate conclusion. Tax rule 4 directs the assessor, in applying the comparative sales method of valuation, to "[m]ake such allowances as he [or she] deems appropriate for differences between a comparable property at the time of sale and the subject property on the valuation date, in physical attributes of the properties, location of the properties, legally enforceable restrictions on the properties' use, and the income and amenities which the properties are expected to produce." (Cal. Code Regs., tit. 18, § 4, subd. (d).) This directive necessarily allows for a degree of inexactitude in the adjustments; mathematical precision is not required. (See *Service America Corp., supra,* 15 Cal.App.4th at p. 1242 [imputed value of nontaxable intangible factors affecting value of property interest "will bear some characteristics of arbitrary selection"].)[20]

_____

[20] *Service America Corp., supra,* 15 Cal.App.4th 1232, involved valuation by means of the income capitalization method of the possessory interest of a franchisee holding the exclusive right to sell food and beverages in a sports stadium. (*Id.* at pp. 1234, 1236.) The court observed that due to the beneficial location, it would be reasonable to value the franchisee's possessory interest at a considerably greater sum than the square-foot rental value of a comparable establishment not located in a sports stadium, but that the county was also entitled to consider the value of the nontaxable exclusive concession and business value that also contributed to the franchisee's profitability. (*Id.* at pp. 1241–1242.) "It seems to us that some form of

Appellants next contend the comparison properties were stale. Section 402.5 requires that in order to be considered comparable, sales of other properties "shall be sufficiently near in time to the valuation date." " 'Near in time to the valuation date' does not include any sale more than 90 days after the valuation date." (§ 402.5.) Accordingly, Property Tax Rules, rule 324(d), provides that the Board "shall not consider a sale if it occurred more than 90 days after the date for which value is being estimated." (Cal. Code Regs., tit. 18, § 324, subd. (d).) The timing of sales is relevant because "[c]omparable sales occurring under different market conditions may require adjustment so that they reflect the same market conditions as the property being appraised." (SBE, Assessors' Handbook, § 501, p. 91 <https://www.boe.ca.gov/proptaxes/pdf/ah501.pdf> [as of Dec. 31, 2020].) "Economic variables affecting demand and supply that have shifted and/or inflationary or deflationary forces in the economy are the causes for this adjustment. . . . Because of the complexity of this adjustment, it should be used with care. As a general rule, it is preferable to use comparable sales occurring near the valuation date of the subject property, thereby avoiding the need for this adjustment." (*Id.* at p. 92.)

_____

'imputed' value must be utilized by the assessor to determine a fair 'rental' value for the property. As we have stated, this imputed value need not be limited by consideration of comparable values for rental properties not associated with a stadium. Obviously whatever final computation is made will bear some characteristics of arbitrary selection. The appeals board may determine that some factor of increase over comparable values is appropriate—150 percent or 200 percent or some other percentage. Whatever imputed value is selected, however, will presumably not result in complete utilization of the agreed $19 million valuation of the total enterprise. The excess of the $19 million over the imputed value of the possessory interest will then appropriately relate to the intangible, nontaxable, assets Service America admittedly possesses." (*Id.* at p. 1242.)

The valuation date for appellants' property was July 12, 2013. The sales dates for the comparables ultimately considered by the Board (Comp 1, 2, 3, Sawdust Trail) were November 2012, April 2013, June 2013, and July 2012. Two of these were at least roughly within 90 days of the valuation date; one was a year prior and the fourth, eight months prior. Again, the difficulty of obtaining comparable sales data for unique rural properties such as appellants' warrants some lenience in the required temporal proximity of the comparison sales to the valuation date for appellants' property.

The record reflects that the Board was well aware of, and concerned about, the differences between appellants' property and the comparison properties used by the Assessor. It addressed this point in its written decision: "The Subject Property and the comparable properties in the Administrative Record, by their very nature as generally remote and rural properties, are in some ways each unique in their own right. This makes determination of a reasonable fair market value based on the Administrative Record challenging but not impossible. The Board is not required to be able to calculate a precise fair market value by mathematical precision, but only to reach an opinion on a reasonable fair market value within its discretion, based on the record."

The Board's observation is correct. "Standards of comparability can never be treated in absolute terms. Even relatively poor data can 'fairly be considered as shedding light on the value of the property being valued' (Rev. & Tax. Code, § 402.5) if it is the best or only data available. Admittedly in this case, only poor comparable data was available, and under such circumstances, the use by the assessor of his four comparables was merely the use of the best available market data. As such, in spite of major dissimilarities, it cannot be said use of the comparables violated Revenue and

27

Taxation Code section 402.5 or rule 4." (*Midstate Theatres, supra,* 55 Cal.App.3d at p. 880.) As we noted in *DFS Group, L.P. v. County of San Mateo* (2019) 31 Cal.App.5th 1059, 1089, "it can be difficult to value unusual or unique properties, and therefore considering comparable values for properties that are not precisely similar may be appropriate even if not alone dispositive. (See *Service America Corp., supra,* 15 Cal.App.4th at p. 1242.) Further, no attempt at valuing a unique or unusual property will likely be precise or flawless. The fact that precisely similar comparable properties may not exist, or that valuation information may not be available for comparable properties, is not the fault of the parties or the experts. These may simply be unavoidable realities."

## III.

Appellants raise a number of other challenges to the Board's actions and decision. First, they complain that the Board mishandled the Assessor's violation of sections 408 and 1606 by failing to take steps to remediate the disadvantage caused by the Assessor's failure to provide them with access to requested information on calculations and evidence that the sale was not an open market sale. Section 408, subdivision (e)(2), requires an assessor to allow an assessee, upon written request, to inspect or copy all information relating to appraisal and assessment of the assessee's property. Section 1606 provides for an exchange of information ahead of a hearing on an application for change of assessment. The statute directs that "[w]henever information has been exchanged pursuant to this section the parties may not introduce evidence on matters not so exchanged unless the other party consents to the introduction," and if a party introduces new material relating to the information received from the other party, the other party must be granted a reasonable continuance if requested. (§ 1606, subd. (d).)

We see no violation of the information exchange requirements. Appellants asked the Assessor for "calculations done on what the Assessor's office deems as comparable properties on list dated 11-3-14." In response, the Assessor stated, "This document has been provided to you on November 13, 2014, copy attached." As earlier described, the documents following this letter in the administrative record include a spreadsheet showing the comparable properties and adjustment amounts for lot size and several other variables. These adjustment amounts *are* the Assessor's calculations: The spreadsheet shows the starting value of each property, the amounts added or subtracted due to differences from appellants' property and the resulting value used as a comparable. "If the exchange of information provides reasonable notice to the opposition concerning the subject matter to be presented at the hearing through the testimony of witnesses and evidence, the statute has been complied with." (*Bank of America v. County of Fresno* (1981) 127 Cal.App.3d 295, 307.)

As for appellants' request for "documented evidence that the transaction on subject properties was not an open market, arms length agreement, willing buyer and seller transaction," the Assessor responded that "[o]ur office does not have any documents responsive to this request." Appellants asked the Board to exclude the SBE annotation from consideration, arguing the Assessor's reliance upon the annotation after failing to disclose it in response to their request for information violated the statutory requirements for exchange of information. As the Board explained in its decision, however, the annotation was legal authority offered to support the Assessor's position, not factual information relating to the property.

Appellants raise several matters as violations of their due process rights. They maintain they were denied a fair hearing to disqualify Board

member Mitchell, when the Assessor was permitted to testify concerning the member's qualifications without being sworn and appellants' objections were summarily dismissed. They argue they were denied a fair hearing due to the lack of calculations for the adjustments of the comparable sales, which they maintain deprived them of the opportunity to cross examine the Assessor about the calculations. They further argue they were denied a fair hearing on June 8, 2017, due to the participation of Board member Mitchell, the lack of substantial evidence to demonstrate the Assessor met her burden of overcoming the purchase price presumption, the admission and use of unreliable evidence, the use of comparable sales evidence from properties that were not comparable to theirs, the Board acting arbitrarily in valuing their property, and the Board failing to issue adequately detailed findings.

Many of these issues need not be further addressed: We have already concluded the Board acted appropriately with respect to the purchase price presumption and the comparable sales valuation, including the complaints about underlying calculations, unreliable comparables, and arbitrary valuation, which appellants now frame as due process violations. What remains are appellants' complaints about their attempt to disqualify Board member Mitchell and the Board's findings.[21]

---

[21] Respondent argues that appellants' due process claims were dismissed by the trial court, when it granted the respondent's motion for summary adjudication of the second through fifth causes of action of the complaint due to appellants' failure to explain their theories or cite legal authority, and that we should reject any reference to these causes of action because appellants have not challenged the trial court's summary adjudication ruling. The respondent's portrayal is not accurate. Respondent's motion for summary adjudication argued not only that appellants failed to plead facts sufficient to state the second through fifth causes of action but also that those causes of action were barred by immunity

With respect to the disqualification hearing, the unsworn statement the Assessor volunteered at the hearing, in full, was as follows: "Mari Wilson, Humboldt County Assessor. I would just like to say, at no time did we ever feel bias toward our office through the whole proceeding. We've not had any contact with Mr. Mitchell outside of the hearings, and he certainly put us to our marks several times throughout the proceeding. So we do not feel any bias toward our office nor have we worked with him." It is difficult to see how this statement could have prejudiced appellants, and appellants offer neither explanation nor authority supporting their assertion that their due process rights were violated. Issues not supported by argument or authority are treated as forfeited on appeal. (*San Mateo Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 559; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784.) The same is true for appellants' complaint that their objections to this unsworn testimony were summarily dismissed.[22]

---

or otherwise unavailable in a tax case. The trial court did not explain its reasoning for granting summary adjudication. Respondent's basic position was that appellants' sole available cause of action was for a tax refund, and respondent expressly recognized that any alleged due process issues with the hearing and decision could be resolved as part of a tax refund action. Appellants' failure to challenge the ruling is not a basis for rejecting their claims of due process violations in the Board's handling of their case.

[22] Appellant did not object to the Assessor's statement at the disqualification hearing, but raised the lack of oath in an email prior to the remand hearing, questioning the propriety of the disqualification hearing procedure and suggesting as alternative ways to resolve the problem that Mitchell recuse himself from the upcoming hearing, the appeal hearing be continued, or appellant "file with Superior Court relating to the contradictory way in which the decision was reached." At the June 2017 hearing, appellant objected to Mitchell's participation and the chairman said, "that issue has been resolved and we're not interested in information about that in this

Appellants also challenge the Board's findings as deficient in various ways. The Board's written findings are required to "fairly disclose the board's determination of all material points raised by the party in his or her petition and at the hearing, including a statement of the method or methods of valuation used in appraising the property. (Rev. & Tax Code, § 1611.5; Cal. Code. Regs., tit. 18, § 324, subd. (e).) Appellants' main contention with regard to determination of all material points is that the Board made no determination regarding one of their four applications for tax refund, application No. 14-73. Appellants argue that the Assessor should have reassessed the property for the lien date following their purchase, January 1, 2014, but failed to do so until November 2014, continuing to use the prior owner's value meanwhile. Appellants maintain the property should have been enrolled at the $153,806.41 purchase price on the lien date following their purchase.

Respondent argues that this issue raised in application No. 14-73 was mooted by the parties' stipulation remanding the matter to the Board. Since the stipulation provided for remand "to determine the value of the Subject property based on evidence in the administrative record of the prior [Board] proceedings on March 12, 2015 and July 20, 2015 (the 'Prior Hearing') and for the [Board] to issue a new decision and new findings of fact as to its determination of the value of the Subject Property," respondent views the stipulation as having "narrowed the issues" to the question of value, mooting

_____

hearing." Appellant responded, "I'm just making an objection . . . [f]or the record" and the chairman replied, "[T]hank you. Okay." Appellant having stated his objection was "for the record," without reference to any unresolved issue regarding the unsworn statement at the disqualification hearing, this exchange cannot fairly be characterized as a summary dismissal of the objection.

other issues raised by the applications. We need not determine the scope of the stipulation. In these proceedings, the Board determined the value of the property as of the date of appellants' purchase in July 2013. Appellants' argument that the Assessor acted improperly with respect to the valuation of the property for the January 1, 2014 lien date does not include any explanation how this allegedly improper conduct affected the Board's determination of value or otherwise prejudiced appellants.

Relying upon the principle that " '[a]s any tax proceeding is *in invitum* in nature, each step must be taken in compliance with law or the proceeding is void' " (*Midstate Theatres, supra,* 55 Cal.App.3d at p. 872, quoting *Universal Cons. Oil Co.* v. *Byram* (1944) 25 Cal.2d 353, 361), appellants' general position on this appeal is that any demonstrated failure to comply with the law or procedural requirements requires us to declare the proceedings void and remand for further proceedings before the Board. Applying this principle to the issue of the Assessor's valuation of the property for the first lien date following appellants' 2013 purchase would make no sense. If the Assessor did act improperly, that historical fact will not and cannot change. If that past act were sufficient to invalidate the present proceedings, it would invalidate any future proceedings as well. This obviously cannot be the result.

Appellants additionally challenge the Board's findings as not explaining the Board's use of comparable sales that were not similar in size to appellants' property, not "disclosing" supporting data or calculations used to reconcile the differences in acreage between appellants' property and the ones used for comparison, and failing to "justify with competent and properly entered evidence [the Board's] decision to increase the value" of the property. These challenges simply recast appellants' claims about deficiencies in the

33

comparable sales analysis, which we have discussed and rejected, as deficiencies in written findings.  The Board's findings address appellants' claims that their property value should be determined by their purchase price and that the comparable sales analysis relied on insufficiently similar properties, and explain the Board's reasons for disagreeing with appellants and for its adjustments to the Assessor's valuation.  More detail in the findings is not required.

## DISPOSITION

The judgment is affirmed.

Costs to respondent County of Humboldt.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.


*Phillis et al. v. County of Humboldt* (A158725)

35

Trial Court:                          Humboldt County Superior Court

Trial Judge:                          Hon. Kelly I. Neel

Appellant Tim Phillis,                No appearance
In Pro. Per.

Attorneys for Respondent:             Office of County Counsel
                                      Jeffrey S. Blanck
                                      County Counsel

                                      Jefferson Billingsley
                                      Interim County Counsel